RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0017p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

EDUARDO JACOBS,

                     *Plaintiff-Appellee*,

    *v.*

RAYMON ALAM and DAVE WEINMAN (18-1124);
DAMON KIMBROUGH (17-2159),

                     *Defendants-Appellants*.

> Nos. 17-2159/18-1124

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-10516—Denise Page Hood, Chief District Judge.

Argued:  December 4, 2018

Decided and Filed:  February 8, 2019

Before:  DAUGHTREY, GIBBONS, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Linda D. Fegins, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellant in 17-2159.  Davidde A. Stella, WAYNE COUNTY, Detroit, Michigan, for Appellants in 18-1124.  Kassem M. Dakhlallah, HAMMOUD, DAKHLALLAH & ASSOCIATES, PLLC, Dearborn, Michigan, for Appellee. **ON BRIEF:**  Linda D. Fegins, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellant in 17-2159.  Davidde A. Stella, WAYNE COUNTY, Detroit, Michigan, for Appellants in 18-1124.  Kassem M. Dakhlallah, HAMMOUD, DAKHLALLAH & ASSOCIATES, PLLC, Dearborn, Michigan, for Appellee.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.

Defendant law enforcement officials Raymon Alam, Dave Weinman, and Damon Kimbrough searched for a fugitive in a house in which plaintiff Eduardo Jacobs lived. Following the search, plaintiff returned home from work, and according to the officers, confronted, pointed a gun at, and then shot at them. The officers returned fire and arrested plaintiff. But that is not the version of the facts we have before us in this interlocutory appeal. Plaintiff admits he had a holstered pistol, but denies that he touched it—let alone drew, pointed, and shot it at the officers.

After a jury acquitted plaintiff of a variety of state criminal charges, he commenced this *Bivens*[1] action against the law enforcement officials, alleging excessive force, false arrest, malicious prosecution, fabrication of evidence, and civil conspiracy. In relevant part, the district court denied defendants qualified immunity. They appeal, contending plaintiff's *Bivens* claims are not viable after the Supreme Court's decisions in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), and *Hernandez v. Mesa*, 137 S. Ct. 2003 (2017) (per curiam), and even if they are, the district court erred in denying them qualified immunity. We affirm in part and dismiss in part for lack of jurisdiction.

I.

A.

The events leading to this lawsuit stem from the U.S. Marshals Service's efforts to apprehend a federal fugitive through its Detroit Fugitive Apprehension Team task force. On the evening of January 3, 2014, a task force comprised of City of Detroit Police Officers Damon Kimbrough and Michael Knox and Wayne County Sheriff's Office Deputies Raymon Alam and Dave Weinman—all deputized as Special Deputy U.S. Marshals—arrived at the Detroit

---

[1]*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

residence of Javier Vargas, Sr., the brother of a fugitive. The officers entered the house, found three individuals (Vargas, Sr., Javier Vargas, Jr., and Michelle Dotson), but not the fugitive. They also swept the house's basement apartment, one leased by plaintiff Eduardo Jacobs.

Following the search, Knox and Weinman escorted Vargas, Sr. outside, and Alam and Kimbrough remained inside with Vargas, Jr. and Dotson. While Knox and Weinman were outside the house, Jacobs arrived. He entered his basement apartment through a back entrance and did not notice the officers' presence (although they were aware of his). Jacobs found a broken mirror leaned against a stairwell door leading to the house's dining room (designed to alert Jacobs to an unauthorized entry from the house) and, in his words, a "ransacked" living space—"[a]ll the doors were on the floor, all the cabinets were on the floor, all the stuff was torn up, somebody [went] through everything." The parties hotly contest what happened next.

Plaintiff's version is straightforward. He bounded up the stairs shouting "who the f--- went into my house?" As he opened the door to the dining room, he saw an unidentified black male (Kimbrough) who was "not supposed to be there," and "spun to run at the same time. . . . [He] reached for [his] pistol in [his] holster and as [he] turned [he] fell down the stairs and never got a chance to get the pistol out of [his] holster." At no time did plaintiff "rack" his gun to chamber a live round, or point or fire his gun,[2] and no one informed him that they were police or gave him a police command. Contemporaneous with turning to flee and reaching for his holster, Jacobs fell down the steps and was shot three times—in the stomach, shoulder, and leg. The entire exchange lasted only a few seconds. Jacobs retreated to his apartment, learned that it was law enforcement officers who shot him, and eventually surrendered. He received medical treatment (including the removal of one bullet), and testing later determined that bullet came from Kimbrough's handgun.

The officers involved in the shooting, Kimbrough and Alam, tell a remarkably different version. As Kimbrough recalled, he was interviewing Dotson and Vargas, Jr. in the dining room when he "heard a loud bang behind" him—Jacobs slamming the door open from the basement. Kimbrough rose, turned around and saw that Jacobs "had a gun pointed at [Kimbrough's] face."

---

[2]Forensic evidence later confirmed that Jacobs did not fire his gun.

Jacobs said, "You're the mother f----- that robbed me last week." Kimbrough instructed Jacobs three times to put the gun down and identified himself as a Detroit Police Officer. Instead, Jacobs fired his gun, and Kimbrough returned fire and sought cover. After exchanging several shots, Jacobs eventually "obeyed the commands from where he was in the basement to come out" after "a few minutes."

Alam's version is similar. He heard Jacobs slam the door open, and saw Jacobs enter the dining room from the basement with his "gun raised at an eye level," pointed at Kimbrough. Alam heard Kimbrough say "police, drop the weapon," "heard two shots . . . being fired and, at that time, . . . returned fire." However, Alam did not witness who fired the shots, and stated he did not see Jacobs fire a gun.

The other two individuals in the dining room, Dotson and Vargas, Jr., offer little else. They recalled sitting in the dining room, hearing "a big boom" and then Jacobs asking, "who the f--- broke into my house." They heard the officers identify themselves, heard gunshots and fled for safety. Contrary to defendants' assertions, neither Dotson nor Vargas, Jr. saw Jacobs hold or fire a gun.

One other person, Detroit Police Sergeant Joseph Abdella, provided testimony about the shooting. Abdella interviewed Jacobs at the Detroit Detention Center after Jacobs's arrest. Abdella testified at Jacobs's preliminary hearing that Jacobs made the following unsolicited statement about pointing a gun at Officer Kimbrough:

> [Jacobs] told me that he could have shot the officer that was in the house, that he had a jump on him, more or less, that he got up there and had a gun right on him. He could have shot that man, but he did not. And that he was looking for some understand[ing] – you know, that he did not pull the trigger when he had the opportunity to.

Abdella's testimony at Jacobs's subsequent criminal trial was more specific:

[H]e told me when he went in to the house, . . . that his room had been broken into in the basement.  He told me that he got his gun and went upstairs to confront the people that broke into his house. . . .  He insisted that he did not pull the trigger or fire a shot. . .  [H]e said he had the gun, he pointed at them and he could've pulled the trigger, . . . but he did not.

Jacobs unequivocally denied telling Abdella that he pointed a gun at anyone.[3]

## B.

The Wayne County Prosecuting Attorney's office brought eleven criminal charges against Jacobs for his role in the shooting:  four counts of assault with intent to do great bodily harm less than murder, in violation of M.C.L. § 750.84; four counts of assault with a dangerous weapon, in violation of M.C.L. § 750.82; two counts of resisting and obstructing, in violation of M.C.L. § 750.81d; and one count of possessing a firearm during the commission of a felony, in violation of M.C.L. § 750.227b.  Following a preliminary examination at which defendants Alan and Kimbrough testified (among others), a state district court judge found probable cause existed to arrest and charge Jacobs and bound him over to circuit court for trial.  A jury subsequently acquitted Jacobs on all charges.

## C.

Jacobs commenced this civil rights action thereafter.  The operative complaint and claims relevant to this appeal are as follows.  Jacobs alleges five *Bivens* actions against Alam, Kimbrough, and Weinman:  (1) excessive force against Alam and Kimbrough; (2) fabrication of evidence against Alam, Kimbrough, and Weinman; (3) civil conspiracy against Alam, Kimbrough, and Weinman; (4) false arrest against Alam and Kimbrough; and (5) malicious prosecution against Alam and Kimbrough.  The district court granted in part and denied in part defendants' motions for summary judgment, holding they were not entitled to qualified

---

[3]Defendants contend Jacobs contradicted himself regarding his actual gun possession, and that we should hold him to early statements indicating he, indeed, held the gun. We disagree. True, Sergeant Abdella's testimony supports the officers' perception of events, but the record evidence reflects Jacobs unequivocally denied telling Abdella that he pointed a gun at anyone.  As set forth below, we lack jurisdiction to resolve this factual dispute. Moreover, Jacobs's testimony that he "reached" for his holstered gun after seeing Kimbrough at the top of the steps is not inconsistent with other testimony indicating he "never had a chance" to touch the weapon.

immunity for these claims.[4]  It then denied defendants' motions for reconsideration.  Defendants timely appealed.

## II.

## A.

We turn first to a threshold issue:  whether plaintiff may proceed with his *Bivens* actions in light of recent Supreme Court guidance.  Recognizing that "the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation," the Supreme Court's 1971 decision in *Bivens* held that an implied damages remedy is available to redress Fourth Amendment injuries.  403 U.S. at 389, 396.  It is a "limited, implied cause of action against federal employees for particularly egregious violations of the Fourth Amendment in an unlawful search and seizure case brought by a private citizen." *Left Fork Min. Co. v. Hooker*, 775 F.3d 768, 774 (6th Cir. 2014).  The "core holding of *Bivens*," the Supreme Court later instructed, is "recognizing in limited circumstances a claim for money damages against federal officers who abuse their constitutional authority." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 67 (2001).  "A *Bivens* remedy is available only if (1) there are no alternative, existing processes for protecting a constitutional interest and, (2) even in the absence of an alternative, there are no special factors counselling hesitation before authorizing a new kind of federal litigation." *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 431 (6th Cir. 2016) (internal quotation marks and brackets omitted).

Following *Bivens*, however, the Supreme Court has "adopted a far more cautious course" in finding implied causes of action. *Ziglar*, 137 S. Ct. at 1855–56.  It has even suggested that the Court's *Bivens* jurisprudence might have developed differently, if at all, if "decided today," *id.* at 1856, and has "made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* at 1857 (citation omitted).  Indeed, the Supreme Court has done so only in two other instances, the last being nearly forty years ago. *See Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment's Cruel and Unusual Punishments Clause provided a prisoner's estate with a

---

[4]It also denied plaintiff's motion for summary judgment, dismissed Knox from the case entirely, and dismissed other claims against defendants.  Jacobs does not cross-appeal.

remedy for failing to provide adequate medical treatment); *Davis v. Passman*, 442 U.S. 228 (1979) (Fifth Amendment Due Process Clause gave a Congressman's assistant a damages remedy for gender discrimination). Since *Carlson*, the Supreme Court has "consistently refused to extend *Bivens* to any new context or new category of defendants." *Ziglar*, 137 S. Ct. at 1857 (citation omitted) (listing numerous cases declining to extend *Bivens*). The Court's clear preference for not expanding such implied remedies is rooted in separation of powers, for "most often," Congress "should decide" whether to provide a damages remedy. *Id.* at 1857–58. As the Court stated, "[t]he Court's precedents now make clear that a *Bivens* remedy will not be available if there are special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* at 1857 (internal quotation marks omitted).

We deal here not with a request by plaintiff to extend *Bivens*, but rather with defendants' contention that we need to reexamine our *Bivens* jurisprudence following the Supreme Court's two most recent *Bivens* decisions—*Ziglar* and *Hernandez*. Before the Supreme Court decided *Ziglar* and *Hernandez*, defendants' appeal would have no merit. The district court's reconsideration order recognized as much:

> Defendants erroneously assert, however, that there is no binding Sixth Circuit precedent recognizing the torts alleged in the current suit. To the contrary, there is Sixth Circuit precedent recognizing every *Bivens* context in question. *See, e.g.*, *Webb v. United States*, 789 F.3d 647, 659-60, 666-72 (6th Cir. 2015) (discussing the merits of *Bivens* actions for malicious prosecution, false arrest, fabrication of evidence, and civil conspiracy); *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014) (discussing merits of *Bivens* action for false arrest); *Burley v. Gagacki*, 729 F.3d 610, 621 (6th Cir. 2013) (explaining plaintiff's burden on motion for summary judgment in *Bivens* action for excessive force).

Unless we deem these Sixth Circuit precedents inconsistent with *Ziglar* and *Hernandez*, we too must follow them. *See, e.g.*, *United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014). Because we have not yet substantively examined this intervening authority, we now take the opportunity to decide what impact, if any, they have on our circuit law.

B.

*Ziglar* is a post-September 11 illegal-alien detention case, wherein federal detainees brought *Bivens* actions against Department of Justice executives and wardens at the detention

facility.  137 S. Ct. at 1853–54.  The detainees essentially challenged two aspects of their detention.  They claimed the government's detention policies subjected them to "harsh pretrial conditions" in violation of the Fourth Amendment and the Fifth Amendment's substantive due process and equal protection clauses, and the wardens knowingly allowed guards to abuse them in violation of the Fifth Amendment's substantive due process clause.  *Id.* at 1853–54.  Before addressing whether the *Bivens* remedy exists for these claims, the Court took great care to emphasize the "continued force" and "necessity[] of *Bivens* in the search-and-seizure context in which it arose."  *Id.* at 1856.  *Bivens* is "settled law," noted the Court, "in th[e] common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere."  *Id.* at 1857.  Thus, *Ziglar* is not about restricting the core of *Bivens*; it continues the Supreme Court's trend of cautioning against expanding its outer reaches.

For our purposes, *Ziglar* clarifies the analytical framework for how courts must approach asserted *Bivens* claims.  The Court defined the "proper test for determining whether a case presents a new *Bivens* context."  *Id.* at 1859.  We must ask whether the case is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court."  *Id.* at 1859.  The Court provided several examples for how a case might be meaningfully different:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.  Differing in a "meaningful way," in the very least, means "an extension" of the *Bivens* remedy, even if just a "modest extension."  *Id.* at 1864.  Once a court determines a new *Bivens* claim is being advanced, it must then look to the special factors analysis; *Ziglar* further clarified this analysis as "concentrat[ing] on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  *Id.* at 1857.  The Supreme Court in *Ziglar* then detailed why the

context of plaintiffs' claims were "new" and presented factors different from the Court's prior *Bivens* cases.

The detention policy claims "challenge[d] the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil." *Id.* at 1860. These claims, reasoned the Court, bore "little resemblance" to its prior cases, and thus differed in a meaningful way. Moreover, the policy claims implicated several special factors that dictated Congress provide a remedy. These factors included: (1) the claims were against high-level individuals seeking changes to executive-branch policies; (2) the claims "challenge[d] more than standard 'law enforcement operations,'" and instead raised a host of inquiries regarding national security policy—"the prerogative of Congress and the President"; and (3) the plaintiffs did not "challenge individual instances of . . . law enforcement overreach, which due to [its] very nature [is] difficult to address except by way of damages actions after the fact." *Id.* at 1861–62.

As for the prisoner-abuse claim, the Court concluded it, too, represented a "modest" extension of *Bivens*. *Id.* at 1864. It did so even in light of the Court's *Carlson* decision, which authorized a *Bivens* claim for mistreating prisoners by failing to provide medical care under the Eighth Amendment. The Court distinguished *Carlson*, noting that the constitutional right in *Ziglar* was predicated upon a different amendment (Fifth) and that judicial guidance for the warden "with respect to his supervisory duties, was less developed." *Id.* Moreover, two other considerations weighed against plaintiffs: the availability of an alternative remedy (a writ of habeas corpus, for example), and Congress's choice "not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment" when it passed the Prison Litigation Reform Act of 1995. *Id.* at 1865. The Court then remanded the case for consideration of whether the "special factors" warranted extending *Bivens* to plaintiffs' prisoner abuse claim. *Id.*

## C.

The Supreme Court issued its *Hernandez* decision a week after *Ziglar*. *Hernandez* involved a cross-border shooting, in which a border patrol agent shot and killed a Mexican teenager standing in Mexico. 137 S. Ct. at 2005. In pertinent part, the question presented was

whether the decedent's parents could assert *Bivens* claims against the agent for violating the decedent's Fourth and Fifth Amendment rights. *Id.* at 2004–05. However, because neither the lower courts nor the parties had the opportunity to consider *Ziglar*, the Court remanded the matter for consideration of this "antecedent" question in the first instance. *Id.* at 2006–07.

D.

*Ziglar* and *Hernandez* are not the silver bullets defendants claim them to be—plaintiff's claims are run-of-the-mill challenges to "standard law enforcement operations" that fall well within *Bivens* itself. In arguing plaintiff's *Bivens* claims are "new," defendants make much out of factual differences between *Bivens*—which involved a warrantless search, unreasonable force during arrest, and an arrest without probable cause, 403 U.S. at 389—and this case. Yet at no point do defendants articulate why this case "differ[s] in a meaningful way" under *Ziglar*'s rubric. Jacobs's action presents no such novel circumstances identified in *Ziglar*. We deal not with overarching challenges to federal policy in claims brought against top executives, but with claims against three individual officers for their alleged "overreach," *Ziglar*, 137 S. Ct. at 1862, in effectuating a "standard 'law enforcement operation[.]'" *Id.* at 1861.

Despite defendants' protestations to the contrary, our circuit has readily provided guidance to individual line officers for how to comply with the Fourth Amendment while carrying out their routine police duties. As the district court aptly noted, we have recognized— for some time now—every one of plaintiff's *Bivens* claims. *See, e.g.*, *Webb*, 789 F.3d 647 (malicious prosecution, false arrest, fabrication of evidence, and civil conspiracy); *Robertson*, 753 F.3d 606 (false arrest); *Burley*, 729 F.3d 610 (excessive force). Given this, and the Supreme Court's express caution that *Ziglar* is not to be understood as "cast[ing] doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose," we hew to this "settled law . . . in th[e] common and recurrent sphere of law enforcement" and find plaintiff's garden-variety *Bivens* claims to be viable post-*Ziglar* and *Hernandez*. 137 S. Ct. at 1856–57; *see also Linlor v. Polson*, 263 F. Supp. 3d 613, 625 (E.D. Va. 2017) ("This is, in all relevant respects, precisely the kind of Fourth Amendment search-and-seizure case Courts have long adjudicated through *Bivens* actions. Defendant[s] ha[ve] identified no meaningful difference, no reason for the Court to doubt its competence to carry the venerable Fourth

Amendment *Bivens* remedy into this context, and no reason to believe that Congress would disapprove of the Court's decision to do so.").

Accordingly, we affirm the decision of the district court as to our *Bivens* jurisprudence.

### III.

Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It is not a "mere defense to liability"; the doctrine provides "*immunity from suit*." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). This immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). A plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). To do so, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted). The district court concluded plaintiff met this standard, and we review that decision de novo.[5] *Sutton v. Metro. Gov't of Nashville & Davidson Cty.*, 700 F.3d 865, 871 (6th Cir. 2012).

However, the scope of our review is circumscribed. "A district court's denial of qualified immunity is an appealable final decision under 28 U.S.C. § 1291, but only 'to the extent that it turns on an issue of law.'" *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005) (quoting *Mitchell*, 472 U.S. at 530). A defendant raising a qualified immunity defense "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995); *see also Kennedy v. City of Cincinnati*, 595 F.3d 327, 333 (6th Cir. 2010). "It is

---

[5]Defendant Kimbrough moved for summary judgment only on the excessive force claim and did not do so for the others. Because he did not universally seek summary judgment, we could deem the majority of his appeal forfeited. *See, e.g.*, *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 528–29 (6th Cir. 2014). We decline to do so—Jacobs invited the district court to rule on the other claims below by filing his own motion for summary judgment, the district court addressed Kimbrough's (non-)entitlement to qualified immunity, and the parties fully briefed the issues here. *Id.*

well-established that 'a defendant challenging the denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Hopper v. Plummer*, 887 F.3d 744, 757 (6th Cir. 2018) (citation and brackets omitted). When a defendant fails to concede the plaintiff's version of the facts for interlocutory appeal, we may exercise jurisdiction only if a defendant "raises the purely legal question of whether the facts alleged support a claim of violation of clearly established law." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007) (citation and ellipses omitted). This includes "an appeal challenging the district court's factual determination insofar as the challenge contests that determination as 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

A.

*Excessive Force (Alam and Kimbrough).* "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Bletz*, 641 F.3d at 750 (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1983)). We have authorized the use of deadly force "only in rare instances." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (citation omitted). "It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012) (internal quotation marks omitted).

*Garner*'s "probable cause" standard governs whether an officer who uses deadly force violates the Fourth Amendment—an officer acts reasonably when deploying deadly force if the "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11. The Court "has identified three non-exclusive factors that lower courts should consider in determining the reasonableness of force used: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Livermore*, 476 F.3d at 404 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Ultimately, the question is "whether the totality of the circumstances justified a particular sort of . . . seizure." *Garner*, 471 U.S. at 8–9. The focus here is on the threat factor,

for the two other factors weigh in plaintiff's favor—he was not committing a crime and was not resisting arrest or fleeing.

"In excessive force cases, the threat factor is 'a *minimum* requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'" *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)). While "[a] suspect need not be armed to pose an imminent threat to an officer's safety," *Mitchell v. Schlabach*, 864 F.3d 416, 422–23 (6th Cir. 2017), merely possessing a weapon is not enough—the officer must reasonably believe the individual poses a danger of serious physical harm to himself or others to justify deadly force. *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007); *see also Dickerson v. McClellan*, 101 F.3d 1151, 1154–55, 1163 (6th Cir. 1996). But on the other end of the spectrum, an officer need not face the business end of a gun to use deadly force. *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017). Instead, "[w]hether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances." *Id.*

"[W]hether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses at that moment. The assessment must be made from the perspective of a reasonable officer in the defendant's position." *Bouggess*, 482 F.3d at 889. But just because we must look at the circumstances through the eyes of a reasonable officer does not mean, as defendants suggest, that we must accept the officers' subjective view of the facts when making this assessment. Given the interlocutory nature of this appeal, rather, we must conduct the reasonable officer analysis using the facts in the light most favorable to plaintiff. *Id.* at 887, 889.

This overlay largely strips us of jurisdiction to consider Kimbrough's and Alam's appeals. Jacobs unequivocally denied taking actions consistent with presenting a reasonable officer with a threat of serious physical harm to himself or others—he went up the stairs shouting "who the f--- went into my house," opened the dining room door, saw Kimbrough, and simultaneously spun to retreat, began to reach for his holstered gun, and was shot. At no time did Jacobs hold the gun, "rack" the gun, point the gun, or fire the gun.

Our caselaw is replete with instances in which we have denied officers qualified immunity when the facts suggest—at least taking them in the light most favorable to the plaintiff—that the suspect did not pose a serious threat to the officer. *See, e.g.*, *King*, 694 F.3d at 662–63 (noting fact dispute as to whether the suspect pointed gun at officers); *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989) (similar); *cf Bletz*, 641 F.3d at 752 (disputed facts over whether decedent was putting gun down when he was shot); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 302–03 (6th Cir. 1998) (disputed facts over whether decedent threatened to get a gun or charged at officers with weapons).

Most applicable is our decision in *Floyd v. City of Detroit*. There, officers responded to a report of the plaintiff brandishing a shotgun, but according to the plaintiff, he was unarmed and yet the officers shot him without warning a "split second" after seeing him. 518 F.3d 398, 402–03 (6th Cir. 2008). The officers contested this version, but that dispute mattered not in *Floyd*: "The officers' contrary assertion that Floyd was in fact armed and fired first is simply irrelevant to our determination of whether a constitutional right would have been violated on the facts alleged by Floyd. As a matter of law, an unarmed and nondangerous suspect has a constitutional right not to be shot by police officers." *Id.* at 407 (internal citation and quotation marks omitted). Because Kimbrough and Alam dispute Jacobs's I-was-not-a-threat account, and do not raise a purely legal question about whether Jacobs's version of the events supports a claim of violation of clearly established law, so too do we lack jurisdiction here. *Livermore*, 476 F.3d at 403; *see also O'Malley v. City of Flint*, 652 F.3d 662, 677 (6th Cir. 2011) ("Once a defendant's argument drifts from the purely legal into the factual realm and begins contesting what really happened, our jurisdiction ends and the case should proceed to trial.") (citation omitted).[6]

Alam has, however, raised one purely legal question over which we do have jurisdiction, but it is of no help to him. He argues that because there is no evidence that his bullets struck

---

[6]Our unpublished decision in *Thornton v. City of Columbus*, upon which defendants rely, does not change this analysis. There, we found officers reasonably perceived a threat sufficient to employ deadly force despite many fact issues. Among other reasons, the officers reasonably believed the plaintiff had threatened others with a gun, actually possessed one, and although the plaintiff "never pointed the shotgun at the Officers before they fired their weapons, the undisputed manner in which [the plaintiff] was holding the weapon combined with the short distance between himself and the Officers further leads this court to conclude that any reasonable police officer would believe that Thornton posed a serious physical threat that required a use of deadly force." 727 F. App'x 829, 837 (6th Cir. 2018). Here, whether Jacobs's conduct presented a threat sufficient to authorize deadly force is in dispute.

Jacobs, Alam did not "seize" Jacobs.  When an officer fires a gun at a person "under circumstances which did not justify the use of deadly force" and when the bullet does not hit the person, the "show of authority . . . ha[s] the intended effect of contributing to [the person]'s immediate restraint" and under our caselaw is a seizure. *Thompson v. City of Lebanon*, 831 F.3d 366, 371 (6th Cir. 2016) (citation omitted); *see also Bletz*, 641 F.3d at 754 ("Under well-established Sixth Circuit precedent, a police officer may be responsible for another officer's use of excessive force if the officer . . . actively participated in the use of excessive force.") (citation omitted).  That Alam's bullets did not strike Jacobs "does not matter." *Thompson*, 831 F.3d at 371.  Thus to the extent the district court denied Alam qualified immunity because he effectuated an alleged unconstitutional seizure, we affirm this part of the district court's order.

B.

*Fabrication of Evidence (Alam, Kimbrough, and Weinman).*  "It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006).  "A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).  Jacobs claims the officers planted a .9-millimeter bullet on the kitchen floor that was previously "chambered" in his gun in an attempt to bolster their claim that he pulled a gun on them before the shooting.

On appeal, defendants do not accept plaintiff's version of the events—that he did not touch his gun, did not eject a round at the top of the steps, and did not keep stray bullets laying around the house—and instead ask us to play a factfinding role.  "The most logical inference," Alam tells us, "is that Jacobs racked his Glock 17 either just before emerging from the basement, or during the actual shooting."  Defendants additionally suggest plaintiff lied about the capacity of his gun, and therefore argue the record blatantly contradicts his version sufficient to grant summary judgment in their favor. *See, e.g.*, *Scott*, 550 U.S. at 380.  We disagree.

Under Jacobs's version of the events, it is impossible for a bullet from his gun to land on the kitchen floor unless it was planted by police officers after the fact in order to cover up a

knowing display of excessive force. Even if his gun's capacity was more than he said, thus providing a possible explanation for the source of the bullet, that fact would not contradict Jacob's testimony that he did not rack or fire his gun. Given this, we lack jurisdiction to consider defendants' appeal on this claim. *See, e.g.*, *Webb*, 789 F.3d at 669; *Moldowan v. City of Warren*, 578 F.3d 351, 397 (6th Cir. 2009).

C.

*False Arrest and Malicious Prosecution (Alam and Kimbrough).* Although analytically distinct, *see Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010), Jacobs's false arrest and malicious prosecution claims seek remedies for similar actions—Alam and Kimbrough arresting plaintiff following the shooting and then participating in his prosecution by falsely testifying in criminal proceedings. *See generally Robertson*, 753 F.3d at 616 (malicious prosecution); *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (false arrest).

On appeal, defendants say the record is devoid of evidence suggesting they lacked probable cause to arrest him or indicating that they provided false testimony at his preliminary examination. In what is likely a familiar refrain by this point, we note that this entire argument is predicated upon our accepting defendants' version of the shooting—that Jacobs at least pulled a gun on the officers (Abdella's testimony) or fired a gun (Kimbrough's and Alam's testimony). Plaintiff, of course, testified that he made no such threatening acts, and if plaintiff's version of the events is validated, Kimbrough and Alam necessarily arrested plaintiff without probable cause and provided the state court with deliberate falsehoods that resulted in his arrest and prosecution without probable cause. We lack jurisdiction to resolve these disputed material facts.

D.

*Civil Conspiracy (Alam, Kimbrough, and Weinman).* "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *Hooks v. Hooks*, 771 F.2d 935, 943 (6th Cir. 1985). "A plaintiff must show that (1) a 'single plan' existed; (2) defendants 'shared in the general conspiratorial objective' to deprive the plaintiff of his constitutional rights, and (3) 'an overt act was committed in furtherance of the conspiracy that caused the plaintiff's

injury.'" *Webb*, 789 F.3d at 670 (citation and brackets omitted). We do not require direct evidence; it is enough to produce circumstantial evidence sufficient to reasonably infer the existence of a conspiracy. *See Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003). The success of this claim falls with the others. Under plaintiff's version of the shooting, and as set forth above, circumstantial evidence exists to support an inference of a conspiracy to fabricate evidence, to falsely arrest Jacobs, and to falsely testify at Jacobs's preliminary hearing. Our limited jurisdiction prevents us from acting further.

## IV.

For these reasons, we affirm the decision of the district court that *Ziglar* and *Hernandez* do not foreclose plaintiff's *Bivens* claims and affirm part of the district court's order regarding Alam's seizure of Jacobs. We dismiss the remainder of the appeal for lack of jurisdiction and remand the case for further proceedings consistent with this opinion.