RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0165p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JAMAL R. WARD,

        *Plaintiff-Appellant*,

    *v.*

CHARLES BROTZKE; AARON THOMPSON; BAILEY RUMSCHLAG,

        *Defendants-Appellees*.

No. 25-1653

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor.
No. 5:23-cv-10096—Judith E. Levy, District Judge.

Argued: April 28, 2026

Decided and Filed: June 12, 2026

Before: THAPAR, BUSH, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Robert G. Kamenec, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellant. Linda D. Fegins, CITY OF DETROIT, Detroit, Michigan, for Appellees. **ON BRIEF:** Robert G. Kamenec, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellant. Linda D. Fegins, CITY OF DETROIT, Detroit, Michigan, for Appellees.

─────────────

## OPINION

─────────────

JOHN K. BUSH, Circuit Judge. A police officer entered a convenience store and spotted a man bearing a partially concealed handgun. The officer asked the man, Jamal Ward, if he had

a concealed pistol license.  Ward answered "no."  The officer then directed Ward to keep his hands raised, away from the gun.  But Ward ignored that order and instead pulled out the weapon and ran toward the store exit.  Two other officers then fired at Ward.  Shots from one officer's gun hit him.  Ward survived and sued all the officers for excessive force under federal and state law.  The district court granted summary judgment to the officers on the grounds of qualified immunity.  We **AFFIRM**.

## I.

In December 2021, Officers Bailey Rumschlag, Aaron Thompson, and Charles Brotzke arrived at the convenience store of a Detroit BP gas station, a "known narcotics location," to perform a sweep.  R. 37-4, Rumschlag Dep., PageID 1064.  Rumschlag and Thompson entered the store while Brotzke remained outside near the front door.

Inside the store, Rumschlag noticed Ward.  What caught the officer's eye in particular was the grip of a handgun protruding from Ward's right pants pocket.  The gun handle prompted Rumschlag to inquire as to whether Ward had a concealed pistol license.  He did not, so Rumschlag ordered the suspect to "keep [his] hands up."  R. 38-16, Rumschlag BWC, at 0:58–1:04.  Rumschlag also grabbed Ward's arms to try to secure them above his head, away from the gun.

But Ward did not comply.  He lowered his arms and began pushing Rumschlag, ignoring the officer's commands to stop.  This commotion captured Thompson's attention.  He ran towards Rumschlag, as Brotzke rushed into the store.  Meanwhile, Ward had freed his right arm from Rumschlag's grip.  That officer noticed that the suspect's hand "immediately went to his handgun."  R. 37-4, Rumschlag Dep., PageID 1065.  Then Rumschlag shouted, "he's pulling [the gun] out" and "he's got it," R. 38-8, Enh'd Vid. Comp., at 1:35–39, as Ward began to run towards the store exit, now holding the gun in his right hand.

Seeing that Ward was armed, Thompson yelled, "I'll shoot you, bro," and fired his weapon twice.  R. 38-20, Thompson BWC at 1:05–11.  One of Thompson's bullets went into a

cooler.  It is unclear where the second one landed, but it missed Ward.[1]  Thompson suggests that he fired because, as Ward continued to flee, he swung his arm, causing the weapon in his hand to "angle[] backwards" toward two of the officers.  R. 37-4, Rumschlag Dep., PageID 1070.  Next, Ward rounded the corner of a store aisle and headed towards the exit.  As he ran, Ward dropped his gun on the ground.

Brotzke, positioned near the exit door, fired approximately four shots at Ward in quick succession as Ward ran toward and out the door.  Brotzke fired the first of these shots almost simultaneously to Ward's decision to drop the gun.  According to Brotzke, he had heard the earlier two shots and saw Ward with a firearm in his right hand.  Brotzke acknowledged that he was not sure who had fired the first two shots (which were, in fact, Thompson's shots) and that he did not see Ward discard his weapon.  But Brotzke also testified that he partially lost sight of Ward for a moment.

Ward was struck four times in total, once each in his right shoulder, right elbow, right leg, and left leg.  He survived but required hospitalization and surgery.  He then sued all three officers for excessive force under federal and state law.  The district court granted summary judgment to the officers based on qualified immunity.  Ward timely appealed, and presses his arguments against Thompson and Brotzke before us.  Ward has abandoned all claims against Rumschlag.

**II.**

We review the district court's grant of summary judgment de novo, taking the facts in the light most favorable to Ward.  *Jackson-Gibson v. Beasley*, 118 F.4th 848, 853–54 (6th Cir. 2024).  Because we have video evidence of the events, we view the facts "'in the light depicted by the videotape' and do not adopt a version of the facts that is 'blatantly contradicted by the record.'"  *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

---

[1]Counsel for the officers represented to the district court, and Ward does not dispute, that there is no evidence to indicate that any of Thompson's shots hit Ward.

### III.

### A.

To overcome qualified immunity, Ward must demonstrate "(1) the defendant[s] violated a constitutional right and (2) that right was clearly established" at the time of the incident. *Thompson v. City of Lebanon*, 831 F.3d 366, 369 (6th Cir. 2016). Because the officers did not violate Ward's constitutional rights, the district court correctly granted summary judgment based on qualified immunity. *See Jones v. Naert*, 121 F.4th 558, 564 (6th Cir. 2024).[2]

### 1.

Ward argues on appeal that Thompson and Brotzke violated his Fourth Amendment rights when they used deadly force against him. Generally, we must "consider separately whether each defendant violated the plaintiff's constitutional rights." *Frenchko v. Monroe*, 160 F.4th 784, 796 (6th Cir. 2025). Ward cannot establish an unreasonable seizure without first establishing that he was seized. *Galas v. McKee*, 801 F.2d 200, 203 (6th Cir. 1986). So, we must determine whether each particular officer seized Ward.

As the Supreme Court recently clarified in *Torres v. Madrid*, 592 U.S. 306 (2021), there are two types of seizures under the Fourth Amendment: "(1) use of force with the intent to restrain; or (2) show of authority with acquisition of control." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 476 (6th Cir. 2020) (citing *Torres*, 592 U.S. at 317–22). For example, an officer seizes a suspect under the first type when the officer shoots at—and hits—a suspect. *Id.* The second type, seizure by acquisition of control, requires that either the suspect voluntarily submit to the officer's show of authority or the suspect's freedom of movement be terminated (through the officer's actions restraining the suspect without physically touching him). *Torres*, 592 U.S. at 322. In other words, to seize a suspect by acquisition of control, the officer must actually take control of the suspect. *Id.* For this second type of seizure, we must

---

[2]The officers alternatively argue Ward's claims are barred under *Heck v. Humphrey*, 512 U.S. 477 (1994). We need not, and do not, address this argument, given that we have implied that the *Heck* bar is not jurisdictional in nature. *See Kitchen v. Whitmer*, 106 F.4th 525, 533–34 & n.4 (6th Cir. 2024).

determine whether the officer's "challenged conduct *objectively* manifests an intent to restrain." *Hopkins v. Nichols*, 37 F.4th 1110, 1115 (6th Cir. 2022) (quoting *Torres*, 592 U.S. at 317).

Brotzke shot at and hit Ward, so Brotzke undoubtedly seized Ward. *See Campbell*, 47 F.4th at 476. Whether *Thompson* seized Ward is a harder question because there is no evidence that either of his shots hit Ward. At the outset, it is obvious that Thompson did not seize Ward under the first type of seizure described in *Torres*—seizure by use of force. Thompson, then, could have seized Ward only through a show of authority with "acquisition of control." *Id.*; *see also California v. Hodari D.*, 499 U.S. 621, 624–26 (1991) (recognizing that a seizure must either include the application of physical force or submission to an officer's show of authority).

But Thompson did not acquire control. Immediately after escaping from Rumschlag's grip, Ward was a fleeing suspect and was not under Thompson's—or any other officer's—control. Crucially, Ward did not voluntarily submit to Thompson's show of authority, nor did Thompson's conduct terminate Ward's freedom of movement. Thus, he was not "seized" by Thompson under the second type of seizure. *See Campbell*, 47 F.4th at 477 ("[A] fleeing man is not seized until he is physically overpowered." (quoting *Brendlin v. California*, 551 U.S. 249, 262 (2007)); *see also Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003) ("[S]hooting at a fleeing felon, but missing, is not a 'seizure.'"); *Cameron v. City of Pontiac*, 813 F.2d 782, 784–85 (6th Cir. 1987) (recognizing that a fleeing suspect was not seized by pursuing officers). Although Ward contends that a "reasonable person in [Ward's] shoes would have understood that he was not free to leave," Ward still "left," despite Thompson's firing his shots. Appellant Br. 19. Under *Torres*, that means Thompson did not seize him by acquisition of control. *See* 592 U.S. at 322 (noting that this type of seizure "requires that 'a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.'" (quoting *Brower v. County of Inyo*, 489 US. 593, 599 (1989))).

Ward was, however, ultimately seized when Brotzke shot him, and Ward argues that Thompson participated in that seizure and therefore still "seized" him. To some degree, he has a point. We have held that an officer can be held liable for his colleague's excessive force if he "actively participated in the use of excessive force . . . ." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Likewise, we have held that an officer seized a suspect when that officer's shots lead

to another officer's shots. *Thompson*, 831 F.3d at 371. In *Thompson*, we reasoned that the first officer's shots constituted a show of authority that contributed to the suspect's restraint. *Id.*; *see also Bletz v. Gribble*, 641 F.3d 743, 754 (6th Cir. 2011) ("Under well-established Sixth Circuit precedent, a police officer may be responsible for another officer's use of excessive force if the officer . . . actively participated in the use of excessive force."). Especially relevant to this case, we determined in *Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019), that an officer seized a suspect when his colleague effectuated a seizure by force, even though the officer shot at and missed the suspect, because the missed shots "ha[d] the intended effect of contributing to the person's immediate restraint." *Id.* at 1042 (cleaned up); *see also Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008) ("The facts as alleged by Floyd demonstrate that [the officer's] firing his weapon at Floyd was a show of authority that actually had the intended effect of contributing to Floyd's immediate restraint.")

*Torres* might be read to abrogate the holdings of these earlier cases from our court. *Torres* established a different framework to analyze the relevant fact pattern where an officer shoots at and misses the suspect and never actually gains control over him. *Torres* explains there are two distinct ways an officer can conduct a seizure: by force or by acquisition of control. *See* 592 U.S. at 322. Thus, an officer has not seized a suspect when he never (1) "applied physical force to [the suspect's] body" or (2) prevented the suspect from further movement. *Id.* at 318, 322; *see Campbell*, 47 F.4th at 476–77. If we read cases like *Thompson*, *Bletz*, *Jacobs*, and *Floyd* broadly to impute a form of bystander liability to officers who did not directly effectuate a seizure, these cases would effectively create a third form of seizure: seizure by presence alone. *Torres* shows that the creation of this additional type of seizure would have been an error. Thus, our prior cases are no longer good law to the extent that they hold that an officer can seize a suspect even if the officer had (1) had no physical contact with a suspect personally or from a weapon, and (2) failed to prevent the suspect from further movement.

Ultimately, we need not consider the continued vitality of these cases because none involved actively fleeing suspects—the men either submitted to the officer's authority or were already incapacitated. The suspect in *Floyd* "halted" after the missed shot, suggesting that he complied with this show of authority. 518 F.3d at 406. Likewise, the suspect in *Thompson* "sat

behind the wheel" and "did not make any threatening moves." 831 F.3d at 369. And the suspect in *Jacobs* "fell down the steps" and "retreated to his apartment," but he "was not . . . fleeing" and "eventually surrendered." 915 F.3d at 1034, 1040. In these cases, then, the missed shots caused "voluntary submission to a show of authority" (*Floyd*) or directly contributed to "the termination of freedom of movement," (*Thompson* and *Jacobs*). *Torres*, 592 U.S. at 322. Officer Thompson's shots, by contrast, did not contribute to Ward's "immediate restraint" in any way because he continued to run out the door afterward. *Thompson*, 831 F.3d at 371.

This conclusion comports with the Supreme Court's repeated admonition that in § 1983 suits, a plaintiff must ultimately show "that each Government-official defendant, through the official's *own* individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (emphasis added). In short, each defendant is liable only if *he* individually has violated the Constitution. An officer's merely being there—or even taking action such as firing at a person at the scene—is not enough to establish a seizure if the officer, in fact, had no physical contact with that person through the use of force or did not help acquire control of that person.

We thus conclude that Thompson did not seize Ward. Therefore, Ward's excessive force claim against Thompson fails, without our having to consider the reasonableness of Thompson's conduct.

**2.**

We do, however, need to evaluate the reasonableness of Brotzke's use of force, given that Ward's wounds from Brotzke's bullets obviously established that Brotzke had seized him. To determine whether a use of force was reasonable, we look objectively at the officer's conduct, considering (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) whether the suspect "actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This list is non-exhaustive, and we look at the totality of the circumstances to determine if the seizure was justified. *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).

The first two factors easily favor Brotzke.  It is undisputed that Ward resisted arrest and attempted to flee.  As to the severity of the crime, carrying a gun without a permit is a felony in Michigan.  Mich. Comp. Laws § 750.227(3); *see Shumate v. City of Adrian*, 44 F.4th 427, 440–41 (6th Cir. 2022) ("Many courts begin this inquiry by focusing on the classification of the offense, i.e., misdemeanor or felony.").  What is more, Ward escalated the matter by grabbing his gun and moving it in the direction of the officers.  *Shumate*, 44 F.4th at 441–42 (explaining that exacerbating an emergency may increase the seriousness of the crime).  So the severity factor also weighs in favor of Brotzke.  *See id.*

This brings us to the most contested factor between the parties: whether Brotzke had probable cause to believe Ward posed an immediate threat.  *See Brosseau v. Haugen*, 543 U.S. 194, 197–98 (2004) (per curiam).  He did.

Brotzke testified that he heard the initial commotion in the store, followed by the sounds of two shots fired, and then he saw Ward round the corner of the aisle with a gun in his hand.  Ward contends that Brotzke's use of deadly force was unjustified because Ward had already dropped his gun on the ground before Brotzke shot him.  But Brotzke testified that he did not see Ward discard the gun, nor did he know who had fired the first two shots.  And the video shows that Ward dropped the weapon less than a second before Brotzke began firing.  We have held that that shooting an unarmed suspect who threw away his gun "a few seconds" earlier was reasonable because the officer "could have fired with the belief that [the suspect] still had the gun in his hand."  *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015).  So for purposes of qualified immunity, we cannot hold it against Brotzke that he was mistaken that Ward still had the gun when he fired shots.  *See White v. Pauly*, 580 U.S. 73, 76–77 (2017) (per curiam).

Ward also argues that he was just trying to exit the store.  But Ward's perspective is not relevant to our evaluation of the reasonableness of Brotzke's force.  We evaluate instead from the perspective of an objective officer.  *Eastep v. City of Nashville,* 156 F.4th 819, 828 (6th Cir. 2025).  In that moment, an objective officer would have had no reason to know what Ward was going to do.  *See Cunningham v. Shelby County*, 994 F.3d 761, 766 (6th Cir. 2021) (judging the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" (quoting *Graham*, 490 U.S. at 396)).

Brotzke heard shots being fired after learning that Ward had a gun, and he only had a fraction of a second to make a decision. *See Bletz*, 641 F.3d at 752 ("The time-frame is a crucial aspect of excessive force cases."); *see also Eastep*, 156 F.4th at 828 (considering "the split-second judgments police officers are often forced to make in tense, uncertain, and rapidly evolving circumstances" (cleaned up)). It was therefore reasonable for Brotzke to think Ward was the shooter and posed a threat to the officers or others. So we conclude that Brotzke is also entitled to qualified immunity.

**B.**

Finally, Ward's state law claims against Thompson and Brotzke fail because the officers are entitled to official immunity. In Michigan, officers are immune from suits for intentional torts when they establish "(1) [their] challenged acts were undertaken during the course of employment and that [they were] acting, or reasonably believed [they were] acting, within the scope of [their] authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature." *Odom v. Wayne County*, 760 N.W.2d 217, 218 (Mich. 2008). "In other words, Michigan state law imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind, in contrast to the objective test for federal qualified immunity." *Shumate*, 44 F.4th at 451 (quoting *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015)). The second factor is the sole one in dispute. Ward contends only that Thompson's statement, "I'll shoot you, bro" as Ward ran towards the exit indicates that Thompson acted with malice. Appellant Br. 39. It does not.

The good faith element is subjective and "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Latits v. Phillips*, 826 N.W.2d 190, 194 (Mich. Ct. App. 2012) (quoting *Odom*, 760 N.W.2d at 229). So long as Thompson and Brotzke reasonably believed they properly used deadly force, they are shielded by immunity for the assault and battery claims "regardless of whether [they were] correct in that belief." *Id.*

Thompson testified that he believed Ward had grabbed the gun and pointed it backward in his direction. Although Thompson may have been mistaken, he reasonably believed that he

was using deadly force to prevent harm to himself or others.  As for Brotzke, he testified that he saw Ward running with a gun towards him, and that he had not seen Ward drop the gun. Viewing this inquiry through the subjective lens of the officers, Ward's argument is unavailing. The district court did not err in granting the officers state-law immunity.

**IV.**

For the foregoing reasons, we **AFFIRM** the district court's judgment.