RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KELLIE FARRIS,

                        *Plaintiff-Appellant*,

    *v.*

OAKLAND COUNTY, MICHIGAN; DEPUTY MARK BOWERING, DEPUTY ERIN VINCENT, DEPUTY JASON MILLER, DEPUTY NOAH HOLLAND, DEPUTY MARK GANEY, DEPUTY JAMES FITZPATRICK, DEPUTY ROSS OGANS, DEPUTY JOSHUA WURFEL; DEPUTY SERGEANT ZACHARY JORDAN; DEPUTY KIMBERLY MICHAL; OFFICER BRANDY MENDICINO; OFFICER JASON WINBORN,

                        *Defendants-Appellees*.

> No. 23-1739

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-10295—Denise Page Hood, District Judge.

Decided and Filed: March 22, 2024

Before: GIBBONS, BUSH, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:** Daniel G. Romano, ROMANO LAW, PLLC, Bingham Farms, Michigan, for Appellant. Steven M. Potter, Trevor S. Potter, POTTER, DEAGOSTINO & CLARK, Auburn Hills, Michigan, for Appellees.

─────────────────

## OPINION

─────────────────

MURPHY, Circuit Judge. Kellie Farris called 911 asserting that another woman had damaged her car. Two sheriff's deputies ended up arresting Farris instead. After they drove

Farris to jail, she alleges that other deputies used excessive force when pulling her out of the vehicle, transporting her to a cell, and removing her clothes. Farris brought federal and state claims against the deputies and their county employer. But the deputies had probable cause for her arrest. And they could reasonably conclude that her suicidal actions necessitated their minimal force. So we agree with the district court that Farris's claims cannot survive summary judgment. We affirm.

I

On March 31, 2019, Farris lived with her two young children at a home in Pontiac, Michigan. A single mother, Farris was also two-months pregnant. Antwuan Kyles, the father of Farris's son, was dating Danniqua Franklin at this time. The three were friends. But Farris and Franklin had gotten into an argument over the phone. Franklin showed up at Farris's home and started threatening her, leading Farris to tell Franklin to get out. Franklin left. Farris then went looking for Kyles, allegedly because he would not answer his phone.

She drove to a nearby home where Kyles's mother lived. Franklin and Kyles were both there. After Franklin and Farris got into an altercation outside this home, Farris called 911. Deputies Brandy Mendicino and Jason Winborn with the Oakland County Sheriff's Office arrived on the scene. Both women told the deputies that Franklin had kicked and dented Farris's car. The deputies also saw the damage. But the two women conveyed different stories about the reason for Franklin's actions.

We start with Franklin's account. She told the officers that, once Farris got to the home, Farris called Franklin from her car and asked Franklin to step "outside" so they could talk. Arrest Rep., R.27-2, PageID 222, 226. As Franklin walked toward Farris's car, Farris allegedly started driving at Franklin to run her over. Franklin "kicked the grill" of the car. *Id.*, PageID 222. Farris then got out of the car and threatened to stab Franklin while waving a knife (which may have been scissors). Franklin walked away. But Farris drove at her again, so Franklin kicked the car a second time. Despite Farris's conduct, Franklin disavowed wanting to prosecute her and suggested that the two "would end up being okay" in a day or so. *Id.*

Farris had a different recollection. She claimed that when she arrived at the home, Franklin ran "up on [her] car" "talking crazy." Farris Dep., R.36-2, PageID 399. Unprovoked, Franklin kicked Farris's car twice. Farris backed her car away, called 911, and remained in the car until the police arrived. Farris denied having a knife but showed scissors to the deputies. Yet she also claimed that she had not threatened Franklin with a weapon.

The deputies found no other witnesses. They tried to interview Kyles, but he did not cooperate. And nobody else had been outside due to the cold Michigan weather.

The deputies thus asked Farris if they could search her car. She consented. They found two pairs of scissors in the center console and a pocketknife wedged in between the sunroof and its visor. The deputies questioned Farris about how Franklin could have known about the knife if Farris had not waved it at her. Farris responded that Franklin knew as a general matter that she kept it "for protection." Mendicino Dep., R.27-3, PageID 242.

The deputies found Franklin more credible than Farris because of Farris's failure to disclose the knife. Before taking any action, though, Mendicino called a supervisor. The supervisor recommended that they arrest Farris because it would "solve the problem and hopefully it will stop them from doing this kind of dumb shit in the future." Patrol Video, at 40:22–:27. Mendicino made the final decision to arrest Farris on the ground that she had committed a felonious assault (an assault with a weapon). Winborn handcuffed Farris, placed her in the backseat of his vehicle, and left for the Oakland County jail.

On the way there, Farris started to strangle herself by "wrapping her head around" her seatbelt, and she also began to make "a gurgling sound." Winborn Dep., R.27-4, PageID 251. Winborn stopped the vehicle, unwrapped the seatbelt, and alerted others. Farris suggested that she wanted to kill herself. Other deputies and paramedics soon arrived to help. They decided to have Mendicino sit in the backseat with Farris. Farris continued trying to harm herself, but Mendicino kept her secure for the rest of the trip.

Given Farris's risky conduct, a "cell extraction team" prepared to take her into custody when she got to the jail. This team included, among others, Deputies Joshua Wurfel, Ross Ogans, James Fitzpatrick, and Kimberly Michal.

Winborn parked his vehicle in the jail's sally port. Farris then saw a "bunch of officers" emerge and shout at her to get out of the car. Farris Dep., R.36-2, PageID 407. Pregnant, handcuffed, and hampered by a bad right knee, Farris alleges that she could not exit quickly. Fitzpatrick saw her with a "seatbelt wrapped around her neck" while Winborn was trying to control her. Fitzpatrick Dep., R.27-7, PageID 270. So Fitzpatrick and Ogans immediately removed her from Winborn's vehicle.

Standing next to the vehicle, deputies put Farris in the "escort position" that the extraction team uses to conduct a "custody search" on uncooperative arrestees. *Id.*, PageID 272–73. A deputy puts the palm of one hand on an arrestee's chin and the other hand on the back of the arrestee's head, while others bend the arrestee over at the waist. In this case, Deputy Ogans put his hands on Farris's head. According to Farris, he at some point started "squeezing" her throat. Farris Dep., R.36-2, PageID 408–09. Another officer pushed up on her arms, forcing her to bend down. The deputies also used a spit hood (which was more like a mask than a hood) to cover her mouth and part of her nose.

A deputy recorded the encounter. The video shows Farris falling and landing on her knees after about 30 seconds in this escort position. Both before and after this fall, she repeatedly lifted her right leg. Farris suggested that her bad "knee gave out." *Id.*, PageID 407. But the deputies believed that she was trying to "kick" them and that she had gone "deadweight" to impede their ability to control her. Case Rep., R.27-5, PageID 260. A deputy yelled for her to "stand up" after the fall, and she complied. CET Video, at 0:57–1:02. Throughout this time, Farris screamed that she could not breathe and that Ogans should get his hand off her face or nose. But the deputies kept her in this position for "a minute or two" while Deputy Michal, a female officer, searched her. Wurfel Tr., R.27-9, PageID 281.

Farris noted that she was pregnant during the pat-down. So the deputies brought out a wheelchair for her to use. As deputies wheeled her to a cell, Deputy Wurfel kept her head up by cupping her chin with the palm of one hand. Another deputy wrapped a blanket around her and the seatback of the wheelchair so she could not fall forward.

As they traveled through the jail, Farris repeatedly demanded that Wurfel remove his hands from her face or nose and stated that she could not breathe. About a minute along the path, she also struggled to get out. Once the deputies restrained her and got moving again, one of them asked if she had "been here before." CET Video, at 4:41–:43. She said yes. She then asked if the deputy holding her face could get his hand off her "throat" but immediately corrected herself: "I mean on my chin, on my chin." *Id.* at 4:45–:47. The deputy speaking with her simultaneously explained that the officer's hand was not on her throat and that he was "holding your chin." *Id.* at 4:47–:48. She admitted to him that she had been "trying to kill" herself, so he concluded that she was "currently suicidal." *Id.* at 5:00, 5:17–:19.

When they reached the cell, the deputies pulled her out of the wheelchair by unraveling the blanket and putting her in the same escort position. They walked her to her cell as she was bent over at the waist with her head down and her arms raised behind her back.

Once inside the cell, the deputies stood Farris against the back wall. Deputy Michal told her that they would "need your clothing" and asked if she would cooperate. *Id.* at 6:53–7:03. Farris responded that she did not feel comfortable taking her clothes off in front of the male deputies. One of the deputies removed her handcuffs to allow her to change and three male deputies exited the cell, leaving only Deputy Michal and another female deputy with Farris. But the male deputy who had been videoing the encounter remained outside the cell, still recording Farris with his phone. So Farris continued to refuse to change. The three male deputies reentered and handcuffed her again. As male deputies held Farris, Michal took off her pants and cut her shirt to remove it.

The deputies uncuffed Farris, removed the spit hood, and left her in the cell alone. Given Farris's suicidal state, they gave her a suicide blanket rather than clothes. A nurse looking into the cell opined that she had no injuries and medically cleared her, but the jail placed her on "active suicide watch." Case Report, R.27-5, PageID 261.

The next day, the county prosecutor decided not to pursue any charges against Farris. The jail released her. Later that day, however, she tragically suffered a miscarriage.

Farris brought a slew of federal and state claims against the deputies and Oakland County. The district court granted summary judgment to all defendants. *See Farris v. Oakland County*, __ F. Supp. 3d __, 2023 WL 4933928, at *6–12 (E.D. Mich. Aug. 2, 2023). We review its decision de novo. *See Gambrel v. Knox County*, 25 F.4th 391, 399 (6th Cir. 2022).

## II. Federal Claims

On appeal, Farris raises Fourth Amendment claims under 42 U.S.C. § 1983 against the arresting deputies and the deputies at the jail. She also argues that Oakland County had an unconstitutional policy of inadequately training its deputies under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). These claims all fall short.

### A. Fourth Amendment Claims Against the Deputies

Farris alleges that two sets of deputies committed two distinct "unreasonable . . . seizures" within the meaning of the Fourth Amendment. U.S. Const. amend. IV. She alleges that Mendicino and Winborn unreasonably seized her because they lacked probable cause for the arrest. And she alleges that the deputies at the jail unreasonably seized her because they used excessive force.

All the deputies respond with a qualified-immunity defense. To rebut this defense, Farris must overcome two hurdles. *See Gambrel*, 25 F.4th at 399. She first must show that the deputies violated the Fourth Amendment. *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018); *Gambrel*, 25 F.4th at 399–400. She then must show that the existing precedent so "clearly established" these Fourth Amendment violations that any "reasonable" officer would have known that the conduct exceeded constitutional bounds. *Wesby*, 583 U.S. at 63 (citation omitted); *see Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam).

We may consider these two requirements in the most appropriate order. *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 925 (6th Cir. 2024). Here, we find it appropriate to resolve Farris's unlawful-arrest claim on the constitutional merits because some of her state-law claims also turn on the same probable-cause question. But we find it easiest to resolve her

excessive-force claim at the second step because Farris has not identified any case that would have "clearly established" the illegality of the deputies' limited force.

### 1.  Unlawful-Arrest Claim

Farris first argues that Deputies Mendicino and Winborn unlawfully arrested her.  The Fourth Amendment permits police officers to arrest a suspect without a warrant as long the officers have probable cause to believe that the suspect has committed a felony.  *See United States v. Watson*, 423 U.S. 411, 414–24 (1976).  This probable-cause test, the Supreme Court has repeatedly explained, does not set "a high bar."  *Wesby*, 583 U.S. at 57 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  An officer must identify only a "substantial chance" that a suspect has committed a crime under all the circumstances that the officer confronted.  *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13 (1983); *United States v. Baker*, 976 F.3d 636, 645–46 (6th Cir. 2020).  Because this test requires far less than the reasonable-doubt standard necessary for a conviction at trial, the police can have probable cause even if it turns out that the suspect did not commit a crime.  *See Fisher v. Jordan*, 91 F.4th 419, 425 (6th Cir. 2024).

Mendicino and Winborn lawfully arrested Farris under these standards.  They had a "reasonable ground" to conclude that she committed a felonious assault (that is, an assault with a dangerous weapon).  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citation omitted); *see* Mich. Comp. Laws Ann. § 750.82(1).  We have long held that eyewitness testimony alone can provide probable cause for an arrest if the officers have no reason to believe that the witness intentionally lied or mistakenly recalled the events.  *See Brown v. Knapp*, 75 F.4th 638, 647–48 (6th Cir. 2023); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999).  And here, Franklin told the deputies that Farris had tried to hit her with her car and threatened to "stab" her with a knife (which, again, could have been scissors).  Arrest Rep., R.27-2, PageID 222.  Unlike an anonymous tipster, Franklin also signed a written statement confirming this account.  *Id.*, PageID 226–27.  And the knife and scissors found in Farris's car corroborated Franklin's story.  *See United States v. Jones*, 953 F.3d 433, 438 (6th Cir. 2020).

To be sure, the deputies also knew that Farris denied Franklin's accusation and claimed that Franklin had been the aggressor.  But the deputies did not have a duty to credit Farris's

account over Franklin's. *See Fisher*, 91 F.4th at 425; *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988). They instead reasonably decided that Farris had the greater credibility problems because she first denied having a knife in her car. They also could reasonably view Farris as the aggressor because she seemingly followed Franklin to the home of Kyles's mother.

In response, Farris argues that a factual dispute exists over whether she denied having a knife. This argument misunderstands the facts. True, she confessed to having the knife *after* the deputies discovered it. Winborn Dep., R.36-4, PageID 445. But the video records her originally denying this claim. Deputy Winborn asked: "Is there a knife involved?" Patrol Video, at 6:45–:46. And she responds: "No, I don't have no knife." *Id.* at 6:46–47. Similarly, when asked whether she had any weapons in the car, Farris was not forthcoming to the deputies about the presence of the knife, describing only the scissors.

Farris also points to the supervisor's statements that her arrest would "solve [a] problem" and stop her from doing "dumb shit" again. *Id.* at 40:22–:27. According to Farris, these statements suggest that the deputies arrested her for reasons unrelated to the charged crime. This argument misunderstands the law. When evaluating whether officers have probable cause, we consider only the encounter's objective facts—not the officers' subjective motives. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Because the objective facts gave the deputies probable cause to arrest Farris for felonious assault, their actual reasons for this arrest are beside the point. *See Criss*, 867 F.2d at 262.

### 2. Excessive-Force Claim

Farris next argues that the deputies at the jail used excessive force when they took her from Winborn's vehicle to her cell. The Fourth Amendment's ban on unreasonable seizures bars police officers from using excessive force when making an arrest. *See Graham v. Connor*, 490 U.S. 386, 394 (1989). And this Fourth Amendment ban continues to apply when correctional officers book an arrestee into a jail. *See Aldini v. Johnson*, 609 F.3d 858, 864–67 (6th Cir. 2010); *see also Manuel v. City of Joliet*, 580 U.S. 357, 364–69 (2017).

To decide whether officers used excessive force, we must balance their safety interests in using the force against an arrestee's liberty interest in avoiding it. *See Graham*, 490 U.S. at 396;

*Gambrel*, 25 F.4th at 400. If officers may lawfully arrest a suspect, they of course may use the "physical coercion" (or threat of coercion) necessary to effect the arrest and get the arrestee into a jail cell. *Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004) (quoting *Graham*, 490 U.S. at 396). For any greater use of force, courts must evaluate all the circumstances to determine whether it violated the Fourth Amendment. *See Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). Common circumstances to consider include whether an arrestee posed a threat to the officers, to themselves, or to others and whether the arrestee resisted arrest or attempted to evade the officers. *See Graham*, 490 U.S. at 396; *Hoogland v. City of Maryville*, 2022 WL 1773416, at *4–5 (6th Cir. June 1, 2022). We analyze these factors from the perspective of a reasonable officer who knows that the police must regularly make quick decisions about whether to use force—not from the perspective of a judge who can repeatedly watch every second of a recorded video. *See Plumhoff*, 572 U.S. at 775.

In this qualified-immunity context, moreover, plaintiffs must show that an officer violated a "clearly established" right against excessive force. *Rivas-Villegas*, 595 U.S. at 5 (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)). A claimed right qualifies as "clearly established" only if it would have been sufficiently clear to any reasonable officer that the challenged conduct violated the right. *See id.*; *Gambrel*, 25 F.4th at 403. And because the excessive-force test depends on each case's unique facts, plaintiffs generally must identify the alleged "clearly established" right with specificity. *Rivas-Villegas*, 595 U.S. at 6. Except in obvious cases, for example, they cannot rely on the general right against excessive force. *See id.* Instead, they must identify analogous caselaw clearly establishing that an officer's specific force violated the Fourth Amendment under the circumstances. *See id.*

Courts must assess each challenged use of force independently. *See Gambrel*, 25 F.4th at 400. Here, Farris alleges that the deputies used excessive force in four ways: (1) by "forcibly" pulling her "from the vehicle"; (2) by putting "a spit hood" over her head; (3) by putting pressure on her "head, face, and neck region"; and (4) by "stripping" off her clothes. Appellant's Br. 32–33. But our cases would not have clearly established the excessive nature of any of these actions.

*Removal from Vehicle*. Farris first argues that the deputies used excessive force by forcibly removing her from Winborn's vehicle without waiting for her to get out on her own. Yet our caselaw would have allowed "reasonable" officers to believe that they should immediately remove Farris. *Rivas-Villegas*, 595 U.S. at 5 (citation omitted). She had repeatedly tried to strangle herself with a seatbelt in the vehicle—so much so that Winborn had to stop and wait for Mendicino to sit next to Farris on the way to the jail. And when Farris reached the jail's sally port, the initial deputy who approached her car door saw her with the seatbelt "wrapped around her neck at least once." Fitzpatrick Dep., R.27-7, PageID 270. This deputy could reasonably conclude that he should quickly extract her from this dangerous situation. *See Hoogland*, 2022 WL 1773416, at *4; *Cabaniss v. City of Riverside*, 231 F. App'x 407, 413–14 (6th Cir. 2007); *Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997).

Critically, moreover, Farris does not genuinely dispute these facts. At her deposition, she claimed that she could not "recall" whether she tried to kill herself in the backseat of Winborn's vehicle. Farris Dep., R.36-2, PageID 396. But this type of "memory lapse[]" cannot create a jury question on the issue. *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 839 (6th Cir. 2021). And while staying at the jail, she even admitted that she "was trying to get out of going to jail so I did something dumb." Emergency Assessment, R.40-2, PageID 624.

*Spit Hood*. Farris next claims that the deputies used excessive force by putting a spit hood on her head. But she identifies no case that would have barred the deputies from temporarily covering her mouth and nose under the circumstances. We have suggested that the short-term use of "spit hoods" (like other modest uses of force) "have their legitimate place." *Jennings v. Fuller*, 659 F. App'x 867, 871 (6th Cir. 2016). Most obviously, officers may use spit hoods on inmates who have *already* spat at them. *See Crossett v. Emmet County*, 2020 WL 8969795, at *4 (6th Cir. Nov. 12, 2020) (order); *see also Williams v. Haure*, 2022 WL 1056085, at *1–2 (7th Cir. Apr. 8, 2022) (order); *Hanson as Tr. For Layton v. Best*, 915 F.3d 543, 546–47 (8th Cir. 2019). Yet little caselaw analyzes when officers may put them on others. *Cf. Allen v. Rivera*, 626 F. App'x 710, 712 (9th Cir. 2015) (mem.). This lack of precedent dooms Farris's claim. Her case does not contain the type of "obvious" facts that would alert any reasonable officer that the spit hood was excessive. *Rivas-Villegas*, 595 U.S. at 6. To the contrary,

reasonable officers could believe that the Fourth Amendment permitted them to temporarily use a spit hood as a preemptive measure on an "uncooperative" detainee like Farris. Fitzpatrick Dep., R.27-7, PageID 267.

In response, Farris seeks a broad rule that the Fourth Amendment prohibits the use of spit hoods on anyone (like herself) who did not threaten to spit. This theory runs into both factual and legal problems. Factually, Farris correctly notes that some deputies at the jail never heard her threaten to spit. That said, Farris can be heard stating, "I swear to God I will spit on his ass" when Winborn had stopped his vehicle on the side of the road. Patrol Video, at 1:20:01–:03. Whether or not the deputies at the jail learned of this comment, it confirms the obvious risk that an unpredictable detainee like Farris might resort to spitting. Legally, Farris identifies no case that clearly establishes her proposed rule. So she cannot seek to impose it on the officers in this qualified-immunity context. *See Rivas-Villegas*, 595 U.S. at 6.

*Pressure on Head*. Farris also claims that the deputies who held her head used excessive force. Yet again, she identifies no cases clearly establishing that their conduct violated the Fourth Amendment. The deputies could instead believe they used the force necessary to safely "effect" the arrest and place Farris in a cell under the circumstances. *Graham*, 490 U.S. at 396. One of the deputies explained that the cell extraction team often uses an "escort position" to help control an "uncooperative" and "unmanageable" arrestee so that the deputies can both search and move the arrestee. Fitzpatrick Dep., R.27-7, PageID 272–73. This position requires a deputy to cup an arrestee's chin with one hand and rest the other hand on the back of the arrestee's head. *Id.*, PageID 273. The deputies could reasonably conclude that Farris's conduct warranted this technique. Before she even reached the jail, she had acted combatively by trying to wrap her head around a seatbelt. When she got out of the vehicle, she then dropped to her knees and repeatedly lifted her leg. Although Farris now says that she engaged in this conduct because of her bad knee, "a reasonable officer on the scene" could believe that she was trying to kick the deputies and refusing to stand up to evade their control. *Graham*, 490 U.S. at 396.

In response, Farris cites her deposition testimony where she said that a deputy was "squeezing" her throat rather than palming her chin. Farris Dep., R.36-2, PageID 408–09. As the district court found, however, the video evidence (which includes her own contemporaneous

statements) refutes this after-the-fact claim. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007). The video repeatedly shows a deputy with his palm under her chin during the encounter. And Farris repeatedly shouted for the deputy to remove his hand from her *face*—not her *throat*. Indeed, she mentioned her throat only once and then quickly corrected herself by saying "I mean on my chin, on my chin." CET Video, at 4:45–:47. A deputy also contemporaneously (and calmly) explained to her: "His hand's not on your throat. It is holding your chin." *Id.* at 4:47–:49. Even if her deposition testimony would permit a reasonable jury to find that a deputy contacted her throat at some unknown point, our caselaw would not establish that this incidental touching violated clearly established law.

Farris also cites caselaw holding that officers may not use "gratuitous" force on compliant arrestees even if it is only minor. *Reed v. Campbell County*, 80 F.4th 734, 750 (6th Cir. 2023) (collecting cases). But these cases do not help Farris because they involved force (such as the slap of a face for backtalk) that had no "legitimate" "justification[.]" *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 404, 407 (6th Cir. 2009). Here, by contrast, Farris's suicidal and uncooperative conduct gave the officers legitimate reasons for the minor force they employed, and our precedent would not have clearly established its illegality.

*Removal of Clothes*. Farris lastly argues that the deputies used excessive force when they "strip searched" her. For a final time, however, Farris does not identify any cases that would have alerted the deputies that their conduct violated the Fourth Amendment. At the outset, she does not dispute that the deputies had both security reasons (to assure she had no contraband) and safety reasons (to remove anything that she could harm herself with) for taking her personal clothes. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330–38 (2012); *Williams v. City of Cleveland*, 907 F.3d 924, 934–37 (6th Cir. 2018); *Peters v. Risdal*, 786 F.3d 1095, 1097 (8th Cir. 2015). She thus does not claim that the officers engaged in this conduct to, say, "harass or humiliate" her. *Cf. Stoudemire v. Mich. Dep't of Corrs.*, 705 F.3d 560, 571 (6th Cir. 2013). Instead, Farris complains about two other aspects of this part of the encounter: Deputy Michal, a female deputy, physically removed her clothes (rather than let Farris take them off herself) and the male deputies remained in the cell when Michal did so.

Our caselaw does not clearly establish that the deputies violated the Fourth Amendment for either reason. *Cf. Sumpter v. Wayne County*, 868 F.3d 473, 480–88 (6th Cir. 2017). For one thing, Farris cites no caselaw that would have prohibited Deputy Michal from removing her clothes on the facts of this case. Of most note, Michal gave Farris the option to take off her clothes on her own. But Farris *refused* even after the male deputies left the cell because at least one male deputy remained nearby. While our cases have generally addressed strip-search policies in which the detainees *themselves* remove their clothes, *see, e.g.*, *Williams*, 907 F.3d at 930–31; *Dobrowolskyj v. Jefferson County*, 823 F.2d 955, 956 (6th Cir. 1987), we could find no precedent that would bar deputies from physically removing the clothes of an inmate who repeatedly "refused" to do so, *Peters*, 786 F.3d at 1098.

For another thing, Farris cites no caselaw that would have prohibited the male deputies from assisting Deputy Michal under the facts of this case. To be sure, our precedent might suggest that a jail policy would raise constitutional concerns if it unnecessarily gave opposite-sex guards the unrestricted ability to view naked detainees. *See Kent v. Johnson*, 821 F.2d 1220, 1226–28 (6th Cir. 1987). *But cf. Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir. 1992) (per curiam); *Timm v. Gunter*, 917 F.2d 1093, 1099–1102 (8th Cir. 1990). Yet nothing of the sort occurred here. The search arose from the case's exigent circumstances: the need for opposite-sex deputies to physically control an uncooperative and suicidal arrestee so that a female deputy could remove her street clothes. If anything, the existing caselaw on this topic would justify the deputies' actions. *See Peters*, 786 F.3d at 1098; *see also Cookish v. Powell*, 945 F.2d 441, 445–49 (1st Cir. 1991) (per curiam); *cf. Mills v. City of Barbourville*, 389 F.3d 568, 579 (6th Cir. 2004).

In response, Farris cites *Fazica v. Jordan*, 926 F.3d 283 (6th Cir. 2019). *Fazica* involved a strip search of an uncooperative arrestee. *See id.* at 285–87. But it did not evaluate the legality of the officers' physical force. *See id.* at 289. Rather, it asked only whether the plaintiff could hold the officers liable for the alleged force even though she could not identify which officer took what action. *Id.* The case thus says nothing about the legality of the deputies' conduct here.

Farris also claims that the deputies violated Michigan's law on strip searches. Michigan allows only officers of the same sex as an arrestee to assist in a strip search of the arrestee. *See* Mich. Comp. Laws Ann. 764.25a(3). But it is not obvious that the deputies even engaged in a "strip search" within the meaning of this law. They did not search Farris. They removed her "street clothes" under Oakland County's "change-out" policy because detainees cannot wear those clothes in the jail. Policies, R.36-13, PageID 542. Regardless, States may pass laws or prison policies that protect their detainees' privacy or liberty more than the Constitution demands. *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 168–76 (2008); *Johnson v. Sootsman*, 79 F.4th 608, 622 (6th Cir. 2023); *White ex rel. Swafford v. Gerbitz*, 892 F.2d 457, 461 (6th Cir. 1989). So Farris has not explained why this alleged state-law violation matters to her Fourth Amendment claim.

### B. *Monell* Claim Against Oakland County

Farris next tries to hold Oakland County liable for the allegedly unlawful arrest and excessive force. But § 1983 does not permit her to hold the county vicariously liable for its deputies' actions. *See Monell*, 436 U.S. at 694. Rather, she must show that a county "policy" or "custom" drove the alleged Fourth Amendment violations. *Gambrel*, 25 F.4th at 408. She cannot do so for either her unlawful-arrest claim or her excessive-force claim.

Her unlawful-arrest claim fails for a straightforward reason. "Axiomatically," a § 1983 plaintiff cannot hold a county liable for a general policy that is allegedly unconstitutional unless that policy has caused a *specific* constitutional violation in the plaintiff's own case. *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1165 (6th Cir. 2021) (quoting *Andrews v. Wayne County*, 957 F.3d 714, 725 (6th Cir. 2020)); *see also Grote v. Kenton County*, 85 F.4th 397, 413–14 (6th Cir. 2023). Because Mendicino and Winborn had probable cause to arrest Farris, this "axiomatic rule" forecloses her unlawful-arrest claim against Oakland County. *Dibrell*, 984 F.3d at 1165.

Her excessive-force claim requires more discussion. She relies on a failure-to-train theory to hold Oakland County liable on this claim. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011). If a county has an unofficial policy of failing to adequately train officers on a type of force, a plaintiff might show that this policy caused the officers to use that force excessively in a

specific case. *See Gambrel*, 25 F.4th at 408. But this theory has "demanding elements." *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997)). Among other things, a county must have acted with "deliberate indifference" to whether the inadequate training would lead its deputies to use excessive force. *Id.* To prove this deliberate indifference, a plaintiff typically must show that the county's officers have engaged in a "pattern" of excessive force that proper training would have prevented. *Connick*, 563 U.S. at 62. In "rare" situations, though, it might be "patently obvious" that a lack of a specific type of training would lead officers to use excessive force. *Id.* at 64. In such a situation, even the single unconstitutional action in the plaintiff's own case might suffice to establish the county's deliberate indifference. *Id.*; *Gambrel*, 25 F.4th at 408.

Here, Farris argues that Oakland County has failed to train its officers about when they should use spit hoods on detainees (especially pregnant women). Yet, even if Farris has shown an inadequacy in the county's training, she has fallen short of establishing its deliberate indifference. Farris does not attempt to prove that the deputies have followed a "pattern" of unconstitutionally using spit hoods. *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008). And she has not shown that the need to train the officers on this precise practice should have been so "obvious" that the use of a spit hood on Farris alone could establish the county's deliberate indifference. *Connick*, 563 U.S. at 64. Most notably, Farris identifies no other training defects. To the contrary, the county's use-of-force policy makes clear that the deputies must "receive annual Use of Force training." Policies, R.36-13, PageID 536; *cf. Ouza v. City of Dearborn Heights*, 969 F.3d 265, 288–89 (6th Cir. 2020). The county thus could reasonably conclude that this general training on the need to employ only "objectively reasonable" force would adequately convey when officers should use spit hoods. Policies, R.36-13, PageID 532; *cf. Gambrel*, 25 F.4th at 410.

Farris lastly argues that the county's "change-out" policy (which allows opposite-sex deputies to help remove an arrestee's personal clothes when necessary) violates Michigan's strip-search law. But again, it is not obvious that a "change out" equals a "strip search." And this state-law issue is irrelevant to this Fourth Amendment claim anyway. *See Moore*, 553 U.S. at 168–76.

### III. State-Law Claims

Farris also appeals the district court's rejection of her state-law claims for false arrest and false imprisonment, assault and battery, intentional infliction of emotional distress, and ethnic intimidation. We can make short work of these remaining claims.

*False Arrest and False Imprisonment.* Farris first renews her claims for false arrest and false imprisonment against Deputies Mendicino and Winborn. But she agrees that these claims required her to prove that the two deputies lacked probable cause to arrest her. *See Odom v. Wayne County*, 760 N.W.2d 217, 229 (Mich. 2008); *Walsh v. Taylor*, 689 N.W.2d 506, 513–14 (Mich. Ct. App. 2004). And the deputies had probable cause. So these state-law claims fare no better than Farris's Fourth Amendment claim against the same two deputies.

*Assault and Battery & Intentional Infliction of Emotional Distress.* Farris also reasserts her claims against the deputies at the jail for assault and battery and intentional infliction of emotional distress. But Michigan's governmental-immunity doctrine protects officers from intentional-tort claims like these. *See Odom*, 760 N.W.2d at 226–28. Under that state-law immunity, a plaintiff cannot hold an officer liable for on-the-job "discretionary acts" as long as the officer engaged in the acts in "good faith" and without "malice" and the acts fell within the "scope" of the officer's "authority[.]" *Id.* Farris does not challenge the district court's conclusion that the deputies satisfied every part of this test. *See Farris*, 2023 WL 4933928, at *11. She instead argues that the deputies forfeited this immunity because their actions were not "justifiably warranted." Appellant's Br. 47 (citing *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984)). As we have already explained to another litigant, however, the Michigan Supreme Court has overruled this objectively "justified" standard. *Odom*, 760 N.W.2d at 229; *see Est. of Hill ex rel. Hill v. Miracle*, 853 F.3d 306, 317 (6th Cir. 2017). Because Farris does not even attempt to meet the governing legal test, these intentional-tort claims fail on immunity grounds.

*Ethnic Intimidation Statute.* That fact leaves Farris's claim against all the deputies under Michigan's ethnic intimidation statute. This statute makes it a crime for a defendant to "[c]ause[] physical contact with another person" or to damage the person's "property" if the

defendant acts both "maliciously" and "with specific intent to intimidate or harass [the other] person because of that person's race, color, religion, gender, or national origin[.]"  Mich. Comp. Laws Ann. § 750.147b(1).  The statute also gives victims of this crime a private right of action to sue perpetrators for damages.  *Id.* § 750.147b(3).  Farris, an African American woman, alleges that the deputies arrested her (and used force against her) because of her race and sex.

But her evidence would not permit a reasonable jury to find that the deputies sought to discriminate against her based on her race or sex.  As a general matter, her two pages of analysis on this claim lump all the deputies together and fail to differentiate between them.  But the statute requires her to prove that *each* "person" she sues—including, for example, Deputy Winborn, who is also African American—acted with animus.  *Id.* § 750.147b(1).

As a specific matter, her two arguments in support of this claim fail to show any deputy's illicit intent.  She first says that a dispute of fact exists over their intent because of the supervisor's comment that Deputies Mendicino and Winborn should arrest Farris to take care of a "problem" and stop her from doing "dumb" things in the future.  Patrol Video, at 40:22–:27.  Setting aside that this comment says nothing derogatory about Farris's race or sex, she did not even sue the supervisor who made it.  And Farris does not point to statements by any of the defendant deputies suggesting that they acted with illegal animus.  *Cf. People v. Stevens*, 584 N.W.2d 369, 370–72 (Mich. Ct. App. 1998).

Farris next says that the deputies' allegedly unlawful actions *alone* show that her race or sex must have motivated their decisionmaking.  But, as we have explained, Deputies Mendicino and Winborn lawfully arrested Farris.  And the deputies at the jail all could reasonably believe that their force was objectively justified under the circumstances.  So this force—by itself—would not allow a reasonable jury to conclude that the deputies acted with a discriminatory intent.

We affirm.