RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0234p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LAMONTE JACKSON-GIBSON; TORIEL DIXON,

          *Plaintiffs-Appellees*,

    *v.*

REGINALD BEASLEY, Sergeant,

          *Defendant-Appellant*.

No. 23-2020

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-12765—Linda V. Parker, District Judge.

Decided and Filed:  October 15, 2024

Before:  COLE, MATHIS, and BLOOMEKATZ, Circuit Judges.

───────────────

**ON BRIEF:**  Linda D. Fegins, CITY OF DETROIT, Detroit, Michigan, for Appellant.  Adam G. Winn, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellees.

───────────────

## OPINION

───────────────

MATHIS, Circuit Judge.  On a Friday night, Lamonte Jackson-Gibson celebrated his birthday with several friends, including his girlfriend, Toriel Dixon.  After midnight, the group took the celebration to Detroit's Greektown neighborhood.  There, they stopped on the sidewalk to listen to street musicians.  Sergeant Reginald Beasley, accompanied by several other police officers, engaged the group and asked them to move along.  Jackson-Gibson questioned Sgt. Beasley as to why he needed to leave, and the situation escalated.  After a series of mostly nonviolent verbal exchanges, with some pushing and pulling thrown into the mix, Sgt. Beasley

tased Jackson-Gibson in his back while he embraced Dixon. Jackson-Gibson and Dixon were then arrested.

In this interlocutory appeal, Sgt. Beasley asserts that he is entitled to qualified immunity from liability for Jackson-Gibson's and Dixon's wrongful-arrest claims and for Jackson-Gibson's excessive-force claim. We dismiss Sgt. Beasley's challenge to the wrongful-arrest claims for lack of jurisdiction. And we affirm the district court's denial of qualified immunity to Sgt. Beasley on Jackson-Gibson's excessive-force claim.

**I.**

In the evening of June 7, 2019, Jackson-Gibson, Dixon, and four other persons celebrated Jackson-Gibson's birthday.[1] Jackson-Gibson and the rest of the group had a few drinks at home and then, around 1:00 a.m., they traveled to Greektown. On that same morning, Sgt. Beasley was assigned to Greektown crowd patrol.

As Jackson-Gibson and his companions walked along Monroe Street, they stopped on the sidewalk to listen to street musicians performing in a nearby parking lot. Sgt. Beasley and several officers passed by the group and Sgt. Beasley told the group to "keep that shit moving." R. 33-9, PageID 569-71. Jackson-Gibson responded with a hand motion, intending to convey the message: "[D]on't talk to us like that." *Id.* at 573. At this point, Sgt. Beasley had walked past Jackson-Gibson, but he turned around and approached Jackson-Gibson.[2] An unrecorded verbal exchange between the two followed. Sgt. Beasley asked, in a "super aggressive" tone and manner, if they heard what he said. *Id.* at 585. Jackson-Gibson indicated that he heard Sgt. Beasley and questioned why he spoke to them that way. Sgt. Beasley then told the group to back

---

[1]When addressing an interlocutory appeal over a district court's denial of qualified immunity, we "defer to the district court's determinations of fact," as well as "the inferences that the district court draws from those facts." *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020) (quotation omitted). "Indeed, ideally we need look no further than the district court's opinion, and we often may be able merely to adopt the district court's recitation of facts and inferences." *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018) (internal quotation marks omitted). Yet if the district court's "version of events is 'blatantly contradicted' by videotape evidence, we must 'view[ ] the facts in the light depicted by the videotape.'" *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 493 (6th Cir. 2012) (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380–82 (2007)).

[2]At this point, Sgt. Beasley's body camera started recording the encounter. The audio started to record 30 seconds later.

up and keep it moving, and Jackson-Gibson asked why they needed to move from public property. All the while, Jackson-Gibson's companions tried to discourage him from engaging.

Sgt. Beasley then warned Jackson-Gibson that he had five seconds to walk away and started counting. Jackson-Gibson responded: "Or what? Or what you going to do?" Before Sgt. Beasley reached "two," he grabbed Jackson-Gibson's left wrist and took out his handcuffs with other hand. People in the crowd said, "Let him go," and one of Jackson-Gibson's companions grabbed Jackson-Gibson's arm and pulled it from Sgt. Beasley's grasp. Simultaneously, the friend led Jackson-Gibson away from Sgt. Beasley and toward a parking lot. Sgt. Beasley then drew his taser and pointed it at the group, while saying, "Step back," "Let him go," and "Walk over here." In response, Jackson-Gibson puffed his chest in Sgt. Beasley's direction.

Dixon then approached Sgt. Beasley and told him multiple times that Jackson-Gibson's father is a police officer and listed his badge number. She told Sgt. Beasley repeatedly, "Don't do it." Jackson-Gibson also stated his father's badge number. Sgt. Beasley repeated his instruction to walk away. Jackson-Gibson and Dixon stepped away into a nearby parking lot.

At that point, Sgt. Beasley left the crowd for a few seconds but then turned back to Jackson-Gibson, who had placed his hands behind his head. As Sgt. Beasley advanced on Jackson-Gibson with his handcuffs in one hand, Dixon swiftly approached saying, "No, no, no." Using one hand, Sgt. Beasley pushed Dixon away. Jackson-Gibson quickly turned around, yelled "don't push her," and clenched his fists. Several of Jackson-Gibson's companions were nearby, and Sgt. Beasley drew his taser in his right hand and ordered that they back up. In the commotion, Dixon wrapped her arms around Jackson-Gibson, and they backed further into the parking lot.

Sgt. Beasley moved to Dixon and Jackson-Gibson, with his taser pointed at them, as they embraced each other. Officer James Fields also pointed his taser at the couple. Sgt. Beasley instructed Jackson-Gibson several times to let Dixon go. Sgt. Beasley pushed Jackson-Gibson, and the couple took a few steps away from him. Then, as Sgt. Beasley faced Jackson-Gibson's back and with the couple still embraced, he tased Jackson-Gibson with a single charge that lasted around five seconds. Officer Fields did not hear Sgt. Beasley warn Jackson-Gibson that he

would be tased, nor can such a warning be heard in the body-cam footage.  Jackson-Gibson fell to the ground screaming.

Officers arrested Jackson-Gibson and Dixon.  They were both charged with obstructing or resisting a police officer.  Jackson-Gibson was also charged with disturbing the peace.  At trial, a jury acquitted them of all charges.

Pertinent here, Jackson-Gibson and Dixon brought claims under 42 U.S.C. § 1983 against Sgt. Beasley for excessive force and wrongful arrest.  Sgt. Beasley moved for summary judgment on the excessive-force claims, arguing that he was entitled to qualified immunity.  Sgt. Beasley did not move for summary judgment on the wrongful-arrest claims.  The district court granted Sgt. Beasley's motion on Dixon's excessive-force claim but denied summary judgment on Jackson-Gibson's excessive-force claim.  Thereafter, the district court denied Sgt. Beasley's motion to reconsider the summary-judgment decision.  Sgt. Beasley then brought this interlocutory appeal.

## II.

We address first whether we have jurisdiction to consider Sgt. Beasley's challenge to Jackson-Gibson's and Dixon's wrongful-arrest claims.  We seldom have jurisdiction over a district court's denial of summary judgment, *Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985), as such an order is rarely a final decision that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," *Catlin v. United States*, 324 U.S. 229, 233 (1945) (citation omitted); *see* 28 U.S.C. § 1291.  The collateral-order doctrine creates an exception to this rule.  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).  Under that doctrine, an order that does not terminate a case may be appealed if the order is: (1) "conclusive on the question it decides"; (2) "resolv[ing] important questions separate from the merits"; and (3) "effectively unreviewable if not addressed through an interlocutory appeal." *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 928 (6th Cir. 2019) (internal quotation marks omitted).  A defendant can immediately appeal the denial of qualified immunity under the collateral-order doctrine, *DeCrane v. Eckart*, 12 F.4th 586, 601–02 (6th Cir. 2021), if the appeal

raises "purely legal issues," *Cockrun v. Berrien County*, 101 F.4th 416, 419 (6th Cir. 2024) (citation omitted).

In his summary-judgment motion before the district court, Sgt. Beasley did not seek qualified immunity from liability for Jackson-Gibson's and Dixon's wrongful-arrest claims. Because Sgt. Beasley did not raise qualified immunity as a defense to the wrongful-arrest claims, the district court had no occasion to grant or deny qualified immunity to Sgt. Beasley for those claims. Therefore, collateral-order doctrine does not apply. And it is undisputed that the district court did not render a final decision. *See* 28 U.S.C. § 1291. Therefore, we lack jurisdiction to consider Sgt. Beasley's argument that he is entitled to qualified immunity from the wrongful-arrest claims.

Sgt. Beasley appears to rely on the *Pinney Dock* exception as a hook for obtaining jurisdiction to pursue his challenge to the wrongful-arrest claims. *See Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988). That exception allows us, "in exceptional cases," to consider arguments raised for the first time on appeal. *McFarland v. Henderson*, 307 F.3d 402, 407 (6th Cir. 2002) (quotation omitted). "The *Pinney Dock* exception is most commonly applied where the issue is one of law, and further development of the record is unnecessary." *Id.* (quotation omitted). Although the *Pinney Dock* exception allows us to adjudicate unpreserved arguments, without a denial of qualified immunity on this claim, it does not provide an independent basis to invoke our interlocutory jurisdiction. *See Rogers v. IRS*, 822 F.3d 854, 863 (6th Cir. 2016) (explaining *Pinney Dock*'s contours).

Accordingly, the only question properly before us is: Did the district court err in denying Sgt. Beasley qualified immunity as to Jackson-Gibson's excessive-force claim? We now proceed to answer that question.

**III.**

Qualified immunity shields government officials from civil damages under § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). "Such immunity is an expression of policy designed to aid in the effective

functioning of government," *Dunigan v. Noble*, 390 F.3d 486, 490–91 (6th Cir. 2004) (internal quotation marks omitted), giving "government officials breathing room to make reasonable but mistaken judgments about open legal questions" so that only the "plainly incompetent or those who knowingly violate the law" are subject to suit, *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted).  "At summary judgment, a government official is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established."  *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (internal quotation marks omitted).  Where video evidence depicts the events, we view the facts "in the light depicted by the videotape" and do not adopt a version of the facts that is "blatantly contradicted by the record."  *Scott v. Harris,* 550 U.S. 372, 380-81 (2007).

We review de novo a district court's denial of qualified immunity at the summary-judgment stage.  *Peterson v. Heymes*, 931 F.3d 546, 553 (6th Cir. 2019).  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

**IV.**

Jackson-Gibson argues that Sgt. Beasley used excessive force by tasing him during the arrest.  We first address whether Sgt. Beasley violated Jackson-Gibson's constitutional right to be free from excessive force.  If so, we will decide whether the constitutional right was clearly established.

**A.**

The Fourth Amendment prohibits unreasonable seizures by police officers.  U.S. Const. amend. IV.  "The Fourth Amendment's ban on unreasonable seizures bars police officers from using excessive force when making an arrest."  *Farris v. Oakland County*, 96 F.4th 956, 964 (6th Cir. 2024).  "Whether an officer exerts excessive force is determined under an objective reasonableness standard."  *Barton v. Martin*, 949 F.3d 938, 952 (6th Cir. 2020) (internal quotation marks omitted).  Objective reasonableness is judged "from the perspective of a reasonable officer at the scene, and not from the 20/20 vision of hindsight."  *Puskas v. Delaware*

*County*, 56 F.4th 1088, 1094 (6th Cir. 2023) (internal quotation marks omitted).  In our review, we consider the totality of the circumstances and specifically address: (1) the severity of the crime; (2) the suspect's immediate threat to officers or others; and (3) whether the suspect is actively resisting or evading arrest.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).

*Severity of Crimes.*  We start by reflecting on the seriousness of the crimes at issue.  The confrontation underlying this action began when Sgt. Beasley approached Jackson-Gibson and his companions as they gathered on the sidewalk listening to street musicians.  Sgt. Beasley believed the group to be loitering, and so he asked them to move along.  Loitering is a civil infraction.  But when Jackson-Gibson did not leave the area, Sgt. Beasley believed that Jackson-Gibson committed the crimes of resisting or obstructing an officer and disturbing the peace.  *See* Mich. Comp. Laws §§ 750.170; 750.479(1)(b).  Resisting or obstructing an officer is a felony offense which prohibits individuals from "knowingly and willfully" obstructing "an officer enforcing an ordinance."  *Id.* § 750.479(2).  Disturbing the peace is a misdemeanor.  *Id.* § 750.170.  Jackson-Gibson was charged with, and acquitted of, those offenses.

We have previously determined that disturbing the peace is "relatively minor" in the excessive-force context.  *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009).

As for the offense of resisting or obstructing an officer, not all felony offenses are severe crimes.  *Shumate v. City of Adrian*, 44 F.4th 427, 441 (6th Cir. 2022).  In fact, "numerous misdemeanors involve conduct more dangerous than many felonies."  *Tennessee v. Garner*, 471 U.S. 1, 14 (1985).  Here, a reasonable jury could find, based on the video evidence, that even if Jackson-Gibson committed the offense of resisting or obstructing an officer, he did so in a nonviolent manner.  True, Jackson-Gibson may have made statements that Sgt. Beasley did not appreciate and, according to Sgt. Beasley, Jackson-Gibson took a fighting stance after Sgt. Beasley shoved Dixon.  But at no point did he act in a manner that a reasonable officer would perceive as violent.  *See Shumate*, 44 F.4th at 441 (opining that even if the officer believed the plaintiff committed the felony offense of resisting or obstructing an officer, "there was minimal (if any) connotation of violence"); *LaPlante v. City of Battle Creek*, 30 F.4th 572, 580 (6th Cir. 2022) ("[T]here is no allegation that Plaintiff's offense was violent or otherwise resulted in any injuries.").

In considering the severity of the offense, we must also weigh the government's interest in public safety. *See Shumate*, 44 F.4th at 442. But because Jackson-Gibson did not act violently and the crimes he allegedly committed were not severe, this interest is low. *Id.*

Sgt. Beasley argues that the crimes were severe because of "the time of night, the size of the crowd whom he was with, [and] the number of pedestrians and innocent bystanders." D. 19 at p.40. Sgt. Beasley's argument, if accepted, transforms innocuous conduct into nefarious criminal activity merely through circumstances unrelated to the supposed underlying crime. We cannot agree with that premise.

Thus, the first *Graham* factor weighs in Jackson-Gibson's favor because a reasonable jury could find that when Sgt. Beasley tased Jackson-Gibson, he exceeded the "*degree* of force" he could reasonably employ based on the severity of the suspected crimes. *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013).

*Immediacy of the Threat.* We begin our analysis of the immediacy-of-the-threat *Graham* factor by repeating Sgt. Beasley's salient concession: "Jackson-Gibson's only *offensively* aggressive act was taking a 'fighting stance' after Sgt. Beasley pushed Ms. Dixon away after she rushed him during his second attempt to place Mr. Jackson-Gibson under arrest." D. 19 at p.41. Sgt. Beasley does not argue that he suspected Jackson-Gibson held or concealed a weapon, nor does he argue that Jackson-Gibson posed an immediate physical threat or made any violent movements or verbal threats. Indeed, the video evidence readily betrays such arguments. Therefore, "the prototypical behavior that would make an officer fear for his physical safety" does not exist here. *Shumate*, 44 F.4th at 444. Without more, Jackson-Gibson's clenched fists, which Sgt. Beasley characterizes as a fighting stance, is more like a "rude gesture" that even when combined with "profane uttering" would not pose more than "a minimal safety threat." *Id.* at 446. Furthermore, Sgt. Beasley did not have "to make a split-second decision in response to rapidly changing circumstances" that suddenly presented an immediate threat. *Palma v. Johns*, 27 F.4th 419, 436 (6th Cir. 2022). Rather, Jackson-Gibson stood still holding his girlfriend for about ten seconds before Sgt. Beasley tased him. Jackson-Gibson did not demonstrate violent mannerisms during the embrace.

Still, Sgt. Beasley contends that we must weigh the immediacy of the threat (or lack thereof) against several other factors. First, he argues that Jackson-Gibson invited escalation by "responding to Sgt. Beasley's cautioning him that he had five (5) seconds to walk away by stating 'or what? Or what you going to do?'" D. 19 at p.41. A reasonable officer would not have perceived these questions as inviting a violent confrontation. Second, Sgt. Beasley argues that Jackson-Gibson physically pulled away during several arrest attempts, but the video evidence indicates that other individuals pulled Jackson-Gibson's arm from Sgt. Beasley. Indeed, shortly after the five-seconds dialogue, Jackson-Gibson moved to the parking lot and placed his hands behind his head, seeming to await his arrest. Finally, Sgt. Beasley notes that Jackson-Gibson was with a crowd of at least six people, thus increasing the threat level. The evidence, viewed in Jackson-Gibson's favor and taken in light of the video proof, does not show that any of the crowd members threatened the officers or acted violently.

Sgt. Beasley's arguments as to the immediacy of the threat posed by Jackson-Gibson do not sway us. We conclude that the second *Graham* factor weighs in Jackson-Gibson's favor and against Sgt. Beasley's use of force.

*Active Resistance or Evasion of Arrest.* "Many of our tasing cases rise and fall with the third [*Graham*] factor." *Shanaberg v. Licking County*, 936 F.3d 453, 456 (6th Cir. 2019). Arguably, this is one such case, as the parties primarily dispute whether Jackson-Gibson *actively* or *passively* resisted arrest.[3]

Under our Fourth Amendment jurisprudence, an officer can tase a suspect who "actively resists arrest . . . to subdue him." *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015). "Active resistance has been found where some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance." *Shumate*, 44 F.4th at 446 (internal quotation marks omitted); *see also King v. City of Rockford*, 97 F.4th 379, 395 (6th Cir. 2024) ("Active resistance can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders." (internal quotation marks omitted)). An officer cannot, however, tase a suspect who does not actively resist arrest

---

[3]Sgt. Beasley does not assert that Jackson-Gibson tried to evade arrest (nor could he, given the clear video evidence).

or who has stopped resisting arrest. *Rudlaff*, 791 F.3d at 642. Surrendering to arrest by law enforcement is one way to stop actively resisting arrest. But it is not the only way. Complying with officers' commands and doing nothing to resist arrest are also ways a suspect can stop actively resisting arrest. *Id.* at 641. And "the fact that a suspect does not immediately surrender does not inherently mean that he is resisting." *LaPlante*, 30 F.4th at 580. So when a suspect passively resists arrest by refusing to comply, an officer cannot use a taser to compel compliance. *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). In other words, "when individuals behave nonviolently and are merely noncompliant, this Court has found that they are only passively resisting arrest, which weighs against the reasonableness of a use of force." *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1005 (6th Cir. 2024).

Viewing the evidence in Jackson-Gibson's favor, a reasonable jury could conclude that he was engaged in passive resistance when Sgt. Beasley tased him in the back. At the time, Jackson-Gibson embraced Dixon and ignored Sgt. Beasley's commands to release her. The embrace lasted around ten seconds. Jackson-Gibson's refusal to comply did not transform his resistance from passive to active. *See id.*

We have previously "elaborated that a failure to present one's arms to an officer upon request without more constitutes passive resistance at most." *King*, 97 F.4th at 396 (internal quotation marks omitted). Jackson-Gibson's refusal to release Dixon, unaccompanied by violent or abrasive actions or threats, "does not reflect a deliberate act of defiance using one's own body," and therefore did not constitute active resistance. *Shumate*, 44 F.4th at 448 (internal quotation marks omitted). And even if Jackson-Gibson had exhibited active resistance when he clenched his fists and took a fighting stance, such active resistance had ceased by the time Sgt. Beasley proceeded to tase him. Indeed, we have found excessive force where a suspect "had stopped resisting." *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012). This is not a case in which "indisputable video evidence shows" that Jackson-Gibson actively resisted by physically pulling away to avoid arrest. *See Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022). And Jackson-Gibson's did not couple his noncompliance with behavior that we have deemed to constitute active resistance. *See, e.g.*, *Kelly v. Sines*, 647 F. App'x 572, 576 (6th Cir. 2016) (finding active resistance where an officer approached an individual sleeping in

his truck who "responded with physical aggression by raising both of his hands above his head and swiping down at [the officer's] head" and, when asked to show his hands, "thrash[ed] and flail[ed] in his seat"); *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012) (finding active resistance where the suspect threatened to "fight[ ] the police" and implied he had a gun and intended to kill himself).

Sgt. Beasley disagrees with this conclusion, highlighting his initial unsuccessful attempt to handcuff Jackson-Gibson. To be sure, Sgt. Beasley failed when he first tried to arrest Jackson-Gibson, but this was not necessarily due to Jackson-Gibson's active resistance. Rather, the video evidence indicates that Jackson-Gibson's companions pulled him away and that he did not obstruct the arrest attempt of his own accord. After the initial arrest attempt, Jackson-Gibson stepped into the parking lot and placed his hands behind his head. This arrest attempt was stifled as well but, once again, not due to Jackson-Gibson. The video evidence makes clear that Dixon's intervention blocked the arrest. In response, Sgt. Beasley pushed her to the ground. At that point, Jackson-Gibson clenched his fists momentarily and then embraced Dixon five seconds later in an act of passive resistance. Notably, no other officer felt compelled to subdue Jackson-Gibson through use of a taser. And Sgt. Beasley never warned Jackson-Gibson that he was about to be tased. *See Cockrell v. City of Cincinnati*, 468 F. App'x 491, 498–99 (6th Cir. 2012) (Cole, J., concurring).

Based on the above, a reasonably jury could conclude that the facts here do not bear "the hallmarks of active resistance," *Shumate*, 44 F.4th at 448, and that Jackson-Gibson's "resistance, if it was resistance at all, was merely passive," *id.* at 447. Accordingly, the third *Graham* factor weighs in Jackson-Gibson's favor.

\*     \*     \*

Considering the totality of the circumstances and the application of the three *Graham* factors, Sgt. Beasley's decision to tase Jackson-Gibson was objectively unreasonable. Jackson-Gibson's alleged crimes were not serious. He did not pose an immediate threat to any officer. And he was not actively resisting or evading arrest. Therefore, the district court did not err in

holding that a reasonable jury could find that Sgt. Beasley violated Jackson-Gibson's Fourth Amendment right to be free from excessive force.

**B.**

We next consider whether the constitutional right at issue was clearly established as of June 2019. To make that determination, "we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Hopkins v. Nichols*, 37 F.4th 1110, 1116 (6th Cir. 2022) (quotation omitted). Although "clearly established law 'should not be defined at a high level of generality,'" *McElhaney v. Williams*, 81 F.4th 550, 556 (6th Cir. 2023) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)), a case with near-identical facts need not exist for a right to be clearly established, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). Indeed, "the *sine qua non* of the 'clearly established' inquiry is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 610 (internal quotation marks omitted).

When Sgt. Beasley tased Jackson-Gibson, "it was clearly established in this circuit that an individual has a constitutional right not to be tased when he or she is not actively resisting." *Browning v. Edmonson County*, 18 F.4th 516, 525 (6th Cir. 2021); *see also Shumate*, 44 F.4th at 450 ("By 2019, . . . the right to be free from physical force when one is not actively resisting the police was clearly established (citations omitted)).

**V.**

For these reasons, we **DISMISS** Sgt. Beasley's appeal as to Jackson-Gibson's and Dixon's wrongful-arrest claims and **AFFIRM** the district court's denial of qualified immunity to Sgt. Beasley as to Jackson-Gibson's excessive-force claim.